INLAND EMPIRE BUILDERS, INC., J.
C. Boespflug Construction Co., and
McLaughlin, Inc.

v.

The UNITED STATES.

No. 429–66.

United States Court of Claims.

April 17, 1970.

Seth W. Morrison, Seattle, Wash., attorney of record, for plaintiffs. Allen, DeGarmo & Leedy, Seattle, Wash., of counsel.

George M. Beasley, III, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COL-LINS, SKELTON, and NICHOLS, Judges.

PER CURIAM:

This case was referred to Trial Commissioner Harry E. Wood with directions to prepare and file his opinion on the issues of plaintiffs' motion for partial summary judgment and defendant's cross-motion for summary judgment under the order of reference and Rule 99(c) [since September 1, 1969, Rule 166(c)]. The commissioner has done so in an opinion and report filed on August 19, 1969, wherein such facts as are necessary to the opinion are set forth. Plaintiffs requested that the court review the commissioner's report and opinion. Defendant urged that the court adopt the report as its decision in this case. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, it hereby adopts the same as the basis for its judgment in this case as hereinafter set forth. Therefore, to the extent that plaintiffs' claims arose in Lease Areas 3–6, the claims are barred by unconditional releases; their state sales tax claims are devoid of merit; to the extent indicated, defendant's motion for summary judgment is granted, plaintiffs' motion for partial summary judgment is denied and the petition is dismissed. Plaintiffs are allowed 30 days from the date hereof to file an amended petition asserting any claims (except those dismissed) they may have arising out of Lease Areas 1 and 2; absent a timely amended petition, plaintiffs' petition shall be dismissed.

OPINION OF COMMISSIONER

WOOD, Commissioner:

This case, before the court on plaintiffs' motion for partial summary judgment and defendant's cross-motion for summary judgment, grew out of a 1959

Capehart Act[1] contract between plaintiffs, joint venturers, and the Department of the Army for the construction of 856 housing units at Fort Lewis, Washington.

Plaintiffs' supplemental petition claims (1) the sum of $538,491.20, in reimbursement for retail sales taxes allegedly paid to the State of Washington at the rate of 4 percent of the total contract price, or, alternatively, the portion thereof ($90,-197.28) said to be attributable to an increase in the state retail sales tax rate after the "contract date"; and (2) the further sum of approximately $64,000, on several claims based on alleged "unilateral direction and improper inspection * * * faulty design * * * [and] delay by the Government * * *."[2]

In its answer, defendant denies any obligation to reimburse plaintiffs for state retail sales taxes, and, as one of several affirmative defenses, avers that unconditional releases executed by plaintiffs at the mortgage closings of four of the six lease areas into which the project was divided discharged defendant from all claims arising out of the areas (Lease Areas 3, 4, 5 and 6) to which they applied.

Plaintiffs, by motion for partial summary judgment "based upon the files and records in this cause * * *,"[3] ask the court, *inter alia*, to hold the releases "invalid as a defense," and to grant plaintiffs summary judgment for $90,197.28 (plus interest) on their alternative sales tax claim. Defendant has cross-moved for summary judgment dismissing the petition, asserting that plaintiffs' sales tax claims lack merit, and that the "remaining claims are barred by general releases * * *."[4] For the reasons hereinafter set forth, it is concluded that defendant's said contentions are correct.[5]

At the outset, the parties argue at some length whether, under Len Co. & Associates v. United States, 385 F.2d 438, 181 Ct.Cl. 29 (1967), the "validity and effect of the releases" and the sales tax claims were subject to administrative determination, or are matters of which the court has "original jurisdiction." *Cf.* Fort Sill Associates v. United States, 183 Ct.Cl. 301 (1968). They also differ as to whether the ASBCA decision sustaining the releases was a ruling on a question of law or fact. *Cf.* Aircraft Associates & Mfg. Co. v. United States, 357 F.2d 373, 174 Ct.Cl. 886 (1966). There are, too, a number of other related contentions having as their common source the provisions of the Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321, 322 (1964).[6]

1.  *See* 12 U.S.C. §§ 1748–1748i; 42 U.S.C. §§ 1594–1594k (1964). Capehart Act project procedures are described in G. L. Christian & Associates v. United States, 312 F.2d 418, 160 Ct.Cl. 1 (1963), cert. denied 375 U.S. 954, 84 S.Ct. 444, 11 L. Ed.2d 314 (1963); Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, cert. denied 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963); Anthony P. Miller, Inc. v. United States, 348 F.2d 475, 172 Ct.Cl. 60 (1965); and H. L. C. & Associates Constr. Co. v. United States, 367 F.2d 586, 176 Ct.Cl. 285 (1966).

2.  Plaintiffs' brief also refers to claims for "improper inspection * * * and excess excavation * * * relating to the removal of allegedly organic material and improper engineering, which claims will be later asserted by amendment."

3.  The record made at the Armed Services Board of Contract Appeals in ASBCA

No. 8077 is before the court. *See* 1963 BCA ¶ 3930; 67–1 BCA ¶ 6162.

4.  The sales tax claims, to the extent related to Lease Areas 1 and 2, are admittedly not so barred. Whether other claims in suit arose in Lease Areas 1, 2, or both, is presently unclear. Defendant actually contends only that the releases are a bar to all claims "to the extent they arose in Lease Areas 3–6, inclusive," and only that narrower aspect of the release issue is here considered.

5.  Other matters (an issue concerning the Federal Housing Commissioner's valuation of on-site utilities; a statutory mortgage amount limitation problem; affirmative defenses raised as to Lease Areas 1 and 2; and plaintiffs' claim that recovery should be "with interest") need not here be reached.

6.  Defendant also claims that "the principles of estoppel should be invoked to bar

The troublesome problems thus raised in the briefs need neither be delineated at any length nor here resolved. The parties agree that there is no genuine issue of material fact as to the release and sales tax issues. There is no reason not to accept their assessment of the record in this respect. Whether the releases bar plaintiffs' claims as to Lease Areas 3–6, and the claims concerning state sales taxes, can be decided, on cross-motions for summary judgment, without any expedition into this treacherous area. *Cf. Chase and Rice, Inc. v. United States,* 354 F.2d 318, 321, 173 Ct.Cl. 740, 745 (1965).

### The Releases

The invitation for bids on the Fort Lewis project, issued December 18, 1958, advised prospective bidders in part that:

* * * If it is desired or necessary to obtain more than one mortgage in order to finance the project, it will be permissible * * * to subdivide the project into two or more units for mortgaging purposes. * * * If such subdivision is proposed, the bidder will submit a suggested division of the project together with a breakdown of the bid into comparable units which will be subject to review and approval by all parties concerned. In accordance with 12 U.S.C. 1748b, the total cost of work payable out of any one mortgage proceeds may exceed the statutory limits of an average of $16,500 per housing unit, providing that the principal obligations of all mortgages effected pursuant to this invitation for bids do not exceed an average of $16,500 per housing unit. If such subdivision of the project is contemplated, there should be submitted information showing whether it is intended to treat each mortgage unit as a separable project to be turned over to the Government as completed on a pro-

gressive schedule and, if so, the number of mortgagor-builder corporations to be formed for the purpose of holding separate leases and mortgages which will pass to the Government pursuant to the completion schedule.

The date set for opening of bids was February 5, 1959. Plaintiffs' bid (of $13,463.280) was successful. Plaintiffs proposed to (and did) divide the project into six lease areas (Lease Areas 1, 2, 3, 4, 5, and 6), each of which was given a separate FHA project number. Plaintiffs also caused to be incorporated six mortgagor-builder corporations (Ft. Lewis Capehart, Inc., No. 1, No. 2, No. 3, No. 4, No. 5, and No. 6). The housing contract, between plaintiffs, defendant, and each of the six mortgagor-builder corporations, was executed May 19, 1959.

Article IV(8) divided "the total amount of the contract" in specified sums, "among the six mortgagor-builder corporations for work which each of said corporations is responsible in accordance with Article I, Paragraph (2.1) * * *" of the contract ("Scope of Work").

Paragraph (2.1), Article I, contained six separate subparagraphs, each pertaining to a different mortgagor-builder (and a correspondingly numbered lease area). Ft. Lewis Capehart Inc., No. 1, "shall be responsible, in accordance with the Building Loan Agreement required by Article V hereof, for all construction within Lease Area 1 * * *." The five other mortgagor-builders and lease areas were linked in like manner.[7]

Article IV(9) provided that:

Upon completion of the improvements, including all landscape requirements, the balance due the eligible builder hereunder shall be payable to the eligible builder upon the expiration of 30 days from the date of final completion and acceptance of the project

---

plaintiffs from now contending that the Board had no jurisdiction over *any* of their * * * claims" in suit. *Compare* Air-A-Plane Corp. v. United States, 408 F.2d 1030, 187 Ct.Cl. 269 (1969).

7. Plaintiffs, as the "eligible builder," were to construct "the housing project * *." Article I(1). "The mortgagor-builder shall pay" plaintiffs for the contract performance the total contract price. Article III(4).

by the mortgagor-builder, the Contracing Officer, the Commissioner and the mortgagee; provided, however, that the mortgagor-builder, the Contracting Officer or mortgagee may withhold approval of final payment until after the expiration of any period which laborers, subcontractors, and materialmen may have for filing notice of mechanics' liens.

Article I ("Definitions") of the contract's General Provisions provided that:

(g) 'Mortgagor-builder' means each and all of the corporations formed by the eligible builder in accordance with his bid and signatory to this contract; though used in the singular throughout the contract, 'mortgagor-builder' shall mean each corporation so formed individually or all such corporations jointly, as the sense may dictate.

\* \* \* \* \* \*

Various terms used in this contract in the singular form shall be construed in the plural where by reason of the formation of more than one mortgagor-builder corporation, the execution of more than one lease, mortgage note, mortgage, Building Loan Agreement, Trade Payment Breakdown, etc., such term of logical necessity applies to more than one entity or instrument.

The contract General Provisions included (and this case centers on) the following release clause:

14. Payment to Eligible Builder.

\* \* \* \* \* \*

(d) Upon completion and acceptance of all work required hereunder, the amounts due the eligible builder under this Housing Contract from mortgage proceeds will be paid by the mortgagor-builder. Final amounts shall be payable after the eligible builder shall have furnished the mortgagor-builder and the Department with a release, if required, of all claims against the Department and/or the mortgagor-builder arising under and by virtue of this Housing Contract, other than such claims, if any, as may be specifically excepted by the eligible builder from the operation of the release in amounts stated herein. \* \* \*

The mortgage closings of the six lease areas occurred as follows:

| Lease Area 5: | May 19, 1960 |
|---|---|
| Lease Area 4: | June 30, 1960 |
| Lease Area 3: | August 22, 1960 |
| Lease Area 6: | August 22, 1960 |
| Lease Area 1: | January 4, 1961 |
| Lease Area 2: | January 4, 1961. |

At the closing of Lease Areas 3, 4, 5, and 6, plaintiffs were represented by an attorney (not present counsel) who had formerly been employed by FHA, and who was well qualified in Capehart Act matters. The procedure for the closing of Capehart Act contracts prescribed by Army Regulations 210–46 was followed. On each occasion, at the appropriate place in the proceeding, plaintiffs' attorney produced and delivered an unconditional release he himself had prepared, and the release was accepted as tendered.

The form of the release in Lease Area 5 was as follows:

Date: May 19, 1960

FHA Project No. 127–81027–Army 15

FT. LEWIS CAPEHART, INC., NO. 5

Contract No. DA–45–108–ENG–4800

RELEASE

The work under Contract No. DA–45–108–ENG–4800 dated May 19, 1959; between the United States of America; FT. LEWIS CAPEHART INC., NO. 5, a Delaware Corporation; and the undersigned, INLAND EMPIRE BUILDERS, INC., J. C. BOESPFLUG CONSTRUCTION CO., and McLAUGHLIN, INC., a joint venture; having been satisfactorily completed and accepted as set forth in the 'Determination of Completion and Notice of Final Acceptance' of even date herewith, the undersigned does hereby remise, release and forever discharge the

United States of America and FT. LEWIS CAPEHART INC., NO. 5, their officers, agents, successors and assigns, jointly and severally, of and from any and all claims and demands whatsoever arising out of or by virtue of said contract, except as follows:

\*    \*    \*    \*    \*    \*

No exceptions were stated. At the closings of Lease Areas 4, 3, and 6, plaintiffs also executed releases identical in form (differing only as to date, FHA project number, and the mortgagor-builder). At the end of each of the latter three releases, plaintiffs added the word "none."

Despite the fact that construction work in Lease Areas 3, 4, 5, and 6 had (to use the ASBCA's language) "generated a number of circumstances \* \* \* which are the bases of the current claims," plaintiffs made no claims for additional compensation until after the mortgage closings in these four lease areas.[8]

Plaintiffs were incurring, and until closing would continue to incur, substantial interest charges. Plaintiffs' representatives had gained the impression that the presentation of claims would result in delays in closings, pending the contracting officer's decision on the claims. The costs of the claimed additional work were not segregated by lease area, and since some of this "additional work" pertained to more than one area and the work was pursued "right up to the time of closing," "claims relating thereto, to that extent, were incapable, prior to completion, of full and exact statement \* \* \*."[9]

These considerations, and the following, prompted [plaintiffs'] attorney-in-fact, to make the 'business decision,' at the first closing, to sign an unconditional release, a practice followed at the closing of three other areas. In an affidavit received in this proceeding he said he—

' \* \* \* was further under the impression that, as only one contract was involved, it was unnecessary to make any formal claim until the completion of the entire contract. Affiant is not aware of any provision in the contract documents which required that claim releases be executed by the prime contractor for each lease area or for the entire contract.' [1963 BCA ¶ 3930 at p. 19,488]

In these circumstances, the ASBCA held, plaintiffs' contract was "not only severable by its nature but expressly so" in some respects; that it was "completely unrealistic to say that the contract Release provisions contemplated one release transaction upon completion and acceptance of all of the work in all of the lease areas"; that, as the contract called for the giving of releases, if required, the releases were not unsupported by consideration; and that, as to Lease Areas 3, 4, 5, and 6, plaintiffs were barred by the releases "insofar as any then existing rights are concerned." 1963 BCA ¶ 3930 at p. 19,489.[10]

■ Plaintiffs' argument that the releases are ineffective to bar the claims in suit starts with the sound observation that a valid release must be supported by consideration. Paccon, Inc. v. United States, 399 F.2d 162, 185 Ct.Cl. 24 (1968). Their principal position is that, for a number of reasons, the releases executed as to Lease Areas 3–6 are not so supported, and therefore do not bar their claims.

■ First, plaintiffs contend that, in exchange for the execution of these re-

---

8. Claims were made prior to the closing of Lease Areas 1 and 2 on January 4, 1961. Releases executed on January 4, 1961, contained a number of stated exceptions of claims "in the nature of continuing claims related to two or more areas but all arising under the one construction contract."

9. The quoted language in this and the following paragraph is that of the ASBCA.

10. Decision on one Lease Area 5 claim, which arose "at the time of or after the giving of the related release," was reserved pending hearing on the merits. *Ibid.* This claim was subsequently allowed. 67–1 BCA ¶ 6162.

leases, they received only monies to which they were otherwise entitled; thus, they urge, notwithstanding the rule of United States v. William Cramp & Sons Co., 206 U.S. 118, 27 S.Ct. 676, 51 L.Ed. 983 (1907), the releases lack consideration and should be disregarded.

In *Cramp & Sons*, a contract between the United States and the claimant called for the execution of a release of all claims prior to final payment, and such a release was given. In disposing of essentially the same argument that plaintiffs here advance, the Supreme Court held that (*Id.*, at 128, 27 S.Ct. at 678):

> No payment of moneys not due is necessary to sustain this release. It is under seal, and *the contract is itself full consideration.* (emphasis added).

■ Decisions of this court that a release called for by a contract is not without consideration, even though the contractor receives only amounts otherwise due, are legion. *E. g.*, J. G. Watts Constr. Co. v. United States, 161 Ct.Cl. 801 (1963); *see also* H.L.C. & Associates Constr. Co. v. United States, *supra*, fn 1; Hellander v. United States, 178 F.Supp. 932, 147 Ct.Cl. 550, (1959); Houdaille Industries, Inc. v. United States, 151 F.Supp. 298, 138 Ct.Cl. 301 (1957); A. L. Coupe Constr. Co. v. United States, 139 F.Supp. 61, 134 Ct.Cl. 392 (1956), cert. denied 352 U.S. 834, 77 S.Ct. 52, 1 L.Ed.2d 53 (1956). Plaintiffs recognize the holdings in *Watts* and other cases following *Cramp & Sons*, but contend that the "basic rule, founded * * * on unnecessary dicta, should be reexamined and abandoned."

■ What plaintiffs term "unnecessary dicta" cannot properly be so characterized. " * * * every proposition of law enunciated, if actually involved in the facts of the case, is to be taken as a principle of law *stare decisis.*" Maddox v. United States, 5 Ct.Cl. 372, 376–377 (1869), aff'd 82 U.S. (15 Wall.)

58, 21 L.Ed. 61 (1872). The "basic rule" of *Cramp & Sons* is sound and settled law.

In asking the court to "abrogate * * * the contract release rule," plaintiffs also assert that the "manifest unfairness and abuseability [*sic*] of the contract release requirement" should make unenforceable any such release "unless in fact sustained by a consideration as usually understood"; that the doctrine is anomalous, unjustified, and unfair; and that defendant should be precluded from having such an advantage. These assertions are wholly unpersuasive.

■ When, in accordance with contract provisions, execution of a release is called for, a determination whether there are any unresolved differences between the contracting parties, and a delineation of any such differences, are legitimate and desirable ends. *See* J. G. Watts Constr. Co. v. United States, *supra*, 161 Ct.Cl. at 810. Where a government contractor has, but fails to exercise, the right to reserve claims from the operation of such a release, [11] it is neither improper nor unfair to invoke the principle that, absent some vitiating circumstance, the contractor "cannot thereafter successfully maintain a suit * * * based upon events which occurred prior to the execution of the release." H.L.C. & Associates Constr. Co. v. United States, *supra*, 367 F.2d at 590, 176 Ct.Cl. at 293.

■ Sprinkled throughout plaintiffs' contentions that the releases lack consideration is another, separate, line of argument. Plaintiffs assert that excepting claims from the releases executed at the closings of Lease Areas 3–6 would have delayed the closings in these areas to their substantial economic detriment, by way of continuing interest charges and delay in receipt of amounts due, and that the releases are therefore invalid because compelled by "constructive duress,"

---

11. *Cf.* Len Co. & Associates v. United States, *supra*, where a contracting officer refused to allow exceptions in releases as to any one lease area until all seven areas were completed. It should be emphasized that the record before the court in *this* case presents no such situation.

"economic duress," or "economic coercion."

Plaintiffs readily concede that the "constructive duress of the arrangement in the present case" cannot be equated to the "extreme coercion" depicted in Aircraft Associates & Mfg. Co. v. United States, *supra*. Plaintiffs urge, however, that the basic reasoning of that case is applicable, and that the result there reached should also be reached here, particularly since defendant "prematurely required releases as a condition of paying funds otherwise due in any event," and the releases are an "unearned windfall" to defendant.[12] On the record before the court (whether or not the court has "original and de novo jurisdiction" to hold that the releases involved in this case are vitiated by duress or coercion) [13] plaintiffs' conclusion is not a tenable one.

In Fruhauf Southwest Garment Co. v. United States, 111 F.Supp. 945, 951, 126 Ct.Cl. 51, 62 (1953), this court stated that:

> * * * In order to substantiate the allegation of economic duress or business compulsion, the plaintiff must go beyond the mere showing of a reluctance to accept and of financial embarrassment. There must be a showing of acts on the part of the defendant which produced these two factors. The assertion of duress must be proven to have been the result of the defendant's conduct and not by the plaintiff's necessities. * * *.
>
> * * * * * *
>
> * * * the mere stress of business conditions will not constitute duress where the defendant was not responsible for those circumstances, * * *.

Measured by the decisional law and the record summarized above, plaintiffs' claim of duress or coercion must be rejected. Fruhauf Southwest Garment Co. v. United States, *supra; see also* Alloy Products Corp. v. United States, 302 F.2d 528, 157 Ct.Cl. 376 (1962); Harvey-Whipple, Inc. v. United States, 342 F.2d 48, 169 Ct.Cl. 689 (1965). As plaintiffs recognize, Aircraft Associates & Mfg. Co. v. United States, *supra*, and this case present markedly different situations; that case is inapposite here. *See also* Urban Plumbing & Heating Co. v. United States, *supra*, again involving quite different circumstances.

Plaintiffs' second lack of consideration argument is that no release was required by the Fort Lewis Capehart contract until final acceptance of and final payment for the entire project. Accordingly, it is asserted, the releases executed as to Lease Areas 3–6 were premature, not contractually required, unsupported by consideration, and ineffective to bar claims.

As the Armed Services Board of Contract Appeals held (and defendant here contends) this narrow construction of the contract—as requiring only a single release at the conclusion of all work—is an unjustified one.

Under the contract, responsibility for construction, and the total contract price, were divided. The contract contemplated the separate phasing-out of the six mortgagor-builders. The mortgagor-builders, "formed for the purpose of holding separate leases and mortgages * * * to pass to the Government pursuant to the completion schedule," were called for by the Invitation for Bids only if "it is intended to treat each mortgage unit as a

12. Whether or not the releases were "prematurely required," another phase of the lack of consideration argument, is discussed *infra*, and decided against plaintiffs. There is no proper basis for characterizing contractually required releases (with the right to state exceptions thereto) as an "unearned windfall."

13. *Cf.* Len Co. & Associates v. United States, *supra*; Aircraft Associates & Mfg. Co. v. United States, *supra*; Urban Plumbing & Heating Co. v. United States, 408 F.2d 382, 187 Ct.Cl. 15 (1969).

separable project to be turned over to the Government as completed * * *." Final payment was prescribed within a definable period after completion and acceptance of each of the separable projects.

Plaintiffs' present construction of the release clause takes into account none of these provisions, and ignores the "Definitions" clause (quoted *supra*) as well. In light of all of its provisions, the contract provided plainly that, upon the completion and acceptance of all work required in each of the several lease areas, a release of all claims against defendant and the mortgagor-builder responsible for that lease area, "other than such claims, if any, as may be specifically excepted * * *" would be given "if required."

In support of the argument that only one release was required by the Fort Lewis contract, and that at the conclusion of all work on the entire project, plaintiffs emphasize (1) segments of the release clause, and (2) language in the Invitation for Bids permitting the total cost of work payable out of any one mortgage proceeds to exceed the statutory limits of an average of $16,500 per housing unit, provided "that the principal obligations of all mortgages effected pursuant to this invitation for bids do not exceed an average of $16,500 per housing unit."

The release clause, read as a whole, and particularly in the context of the entire contract, is to the contrary. And, in the light of other language in the Invitation for Bids, the contract provisions, and the conduct of the parties, the quoted Invitation for Bids language does not aid plaintiffs' case.[14]

In short, releases were contractually required as to Lease Areas, 3, 4, 5, and 6, and those releases are not unsupported

by consideration. United States v. William Cramp & Sons Co., *supra*; J. G. Watts Constr. Co. v. United States, *supra*.

This conclusion is reinforced by the fact that, at the closing of each of these lease areas, plaintiffs' then attorney produced and delivered, and defendant accepted, a release he himself had prepared. That attorney had formerly been employed by FHA, and was well qualified in Capehart Act matters. Clearly, plaintiffs then were of the view that a release was due at each closing. This practical interpretation of the contract by the parties, at a time when it was not a subject of controversy, is entitled to great, if not controlling, weight. Chase & Rice, Inc. v. United States, *supra*; Blanchard v. United States, 347 F.2d 268, 273, 171 Ct.Cl. 559, 566 (1965); Crown Coat Front Co. v. United States, 292 F.2d 290, 292–293, 154 Ct.Cl. 613, 617 (1961).[15]

Finally, plaintiffs assert that they "should be permitted to rescind the releases under equitable principles." This contention is supported only by dictum from United Fruit Co. v. United States, 186 F.2d 890, 896 (1st Cir. 1951), concerning a "gratuitous" release held to be "a nullity for lack of consideration." *Id.*, at 894. That case has no relevance here. Plaintiffs make no showing of entitlement to any relief in this respect.

In H.L.C. & Associates Constr. Co. v. United States, *supra*, fn. 1, a Capehart Act contractor executed releases as to two of the three mortgage areas into which the project was divided. The court held that the release executed with respect to one of the mortgage areas contained a reservation "so broad as to make the release virtually meaningless," and "released nothing," but that the unconditional release executed with respect to the other mortgage area barred the claim

---

14. Palmer Bituminous Corp., ASBCA No. 9935, 65–1 BCA ¶ 4612 (1965), and Murray-Sanders & Associates and George A. Fuller Co., ASBCA No. 6934, 61–2 BCA ¶ 3221 (1961), cited by plaintiffs, are factually distinguishable from this case.

15. Plaintiffs' suggestion that if the contract be deemed ambiguous, it be construed against defendant as drafter, is "now of no moment." Crown Coat Front Co. v. United States, *supra*.

sued on. *Id.*, 367 F.2d at 591–593. 176 Ct.Cl. at 295, 297–298.[16]

As plaintiffs observe, the contract before the court in that case contained a specific clause for the "severability of contract as to each project," while plaintiffs' contract contains no such specific clause. In light of plaintiffs' contract as a whole, however, what the court there held is equally applicable here:

> The situation with respect to [Lease Areas 3–6] is therefore identical to the situation upon which the decision in *Watts* turned:
>
> > * * * there is nothing in the * * * facts which serve * * * to place this case in any of these * * * [excepted] categories. All we have is the simple case of a contractor who completed his contract, and, as provided by the contract, received his final payment upon the execution of a full release, and then * * * later attempts to assert claims. * * * [H.L.C. & Associates Constr. Co. v. United States, *supra,* 367 F.2d at 591–592, 176 Ct. Cl. at 295.

To the extent that plaintiffs' claims arose in Lease Areas 3–6, they are barred by valid and unconditional releases.

### The State Sales Tax Claims

■ Article 41 of the contract's General Provisions pertained to "Federal, State and Local Taxes (Except Real and Personal Property Taxes)." The provisions of Article 41 (the only contract Article relating to this issue) are set forth in Appendix A, attached.

Article 41(a) defined the "contract date," for Article 41 purposes, as "the date set for the opeing of bids" (February 5, 1959).[17] Article 41(b) stated that, except as otherwise provided in the contract "the contract price includes all Federal, State and local taxes * * * in effect and applicable to this Housing Contract on the contract date, except taxes from which the eligible builder or the transactions or property covered by this Housing Contract are then exempt."

On February 5, 1959, the state retail sales tax rate was "equal to three and one-third per cent of the selling price." Effective April 1, 1959, the tax rate was increased to 4 percent, and, plaintiffs say, the full 4 percent tax rate was applied to the entire contract price, requiring that plaintiffs pay to the State of Washington some $559,165.14. A portion of this amount (assertedly $90,197.28) was "assessed against the contract price in addition to the tax in effect and applicable on the contract date." Plaintiffs contend that the court should grant summary judgment in their favor for that portion of their sales tax payment attributable to the April 1, 1959, tax rate increase. Defendant's position is that any recovery on the state sales tax claims is unwarranted.

Before the Board, plaintiffs contended (1) that "notwithstanding the provisions of the contract [defendant] as owner remains responsible for the tax and is obligated to reimburse * * *" plaintiffs therefor by reason of Washington State law, and (2) that, "in any event, under the provisions of the contract, [defendant] is liable to [plaintiffs] for the amount of any increase in tax from the applicable rate on the contract date * * *." The Board held that, insofar as the claims were ascribable to Lease Areas 3–6, they were barred by releases, but that, releases aside, the claims were "without merit." [18]

16. *Cf.* WRB Corp. v. United States, 183 Ct.Cl. 409, 417 (1968), where defendant, relying on releases (with exceptions) executed at the closing of each mortgage, "failed to request the specific findings that would require discussion of the releases as they relate to the various claims."

17. For additional construction, supplies or services procured by amendment to the contract, the "contract date" was defined by Article 41(a) as "the date of such amendment."

18. Defendant, admitting that this decision is not entitled to finality, argues that it is right.

In this court, plaintiffs in effect concede that defendant is not liable to them with respect to state retail sales taxes in effect and applicable to the contract on February 5, 1959.[19] As to the alternative claim, however, plaintiffs have first asserted that Article 41(b) can mean only that defendant intended plaintiffs *not* to "be responsible for additional taxes or tax increases" after the contract date.

This argument founders on Article 41(c). That provision directs an increase in contract price should plaintiffs have to pay or bear the burden of "an increase in rate of any *Federal* tax or duty," and a decrease in contract price should plaintiffs not have to pay or bear the burden of any "*Federal*" tax or duty which was to be pursuant to Article 41(b), or which was included in the contract price. Article 41(c)(4) makes it plain that any such adjustment under other provisions of Article 41 shall not extend to "any State and local taxes." On a fair reading of Article 41, just as plaintiffs would be entitled to benefit from a reduction in such taxes subsequent to February 5, 1959,[20] plaintiffs bear responsibility for any increases in state sales taxes subsequent to that date. *Cf.* Duhame v. United States, 119 F.Supp. 192, 127 Ct. Cl. 679 (1954); Wolf, State and Local Taxation, 36 (Government Contracts Monograph No. 5, 1962).

In their reply brief, plaintiffs urge that, absent Article 41(b), defendant, as "buyer," would have been required by state law to pay "all of the taxes assessed against the project, even without any contract language agreeing to do so"; that Article 41(b) merely "excuses" defendant from having to pay that portion of the state retail sales taxes in effect and applicable to the contract on February 5, 1959; and that, by reason of "the contract provision and the law of the State of Washington," defendant must at least bear the burden of any increase in state retail sales taxes after the contract date. This line of argument must also be rejected.

In Murray v. State of Washington, 62 Wash.2d 619, 384 P.2d 337 (1963), appeal dismissed, Inland Empire Builders, Inc. v. Washington, 378 U.S. 580, 84 S.Ct. 1910, 12 L.Ed.2d 1035 (1964), several contractors (including plaintiffs) sued to recover state retail sales taxes paid under protest, and to enjoin assessment of the state retail sales tax, in connection with the construction of Capehart Act housing at military installations in the State of Washington. The litigation, involving the contract presently before this court, resulted in holdings that, under Washington law, the mortgagor-builder corporations were the "buyers" obligated to pay the state retail sales tax to the contractors; that the mortgagor-builder corporations were not agents of the United States; that the sales tax was properly levied; that the contractors "were obligated to collect the tax from the mortgagor-builder corporations"; and that, having failed to collect the tax, the contractors were liable for it. All else aside,[21] plaintiffs' reliance on state law as imposing any responsibility for state retail sales taxes on defendant is misplaced.

In sum, plaintiffs are not entitled to reimbursement for state retail sales taxes in effect on the "contract date," or for subsequently increased state retail sales taxes.

## CONCLUSION

Therefore, to the extent plaintiffs' claims arose in Lease Areas 3–6, the claims are barred by unconditional releases; their state sales tax claims are devoid of merit; to the extent indicated, defendant's motion for summary judgment is granted, plaintiffs' motion for

---

19. In light of the terms of Article 41(b), the concession is a proper one.

20. *Cf.* United States v. Standard Rice Co., 323 U.S. 106, 65 S.Ct. 145, 89 L.Ed. 104 (1944).

21. Defendant asserts that a claim based upon state law rather than upon contract is "outside of the jurisdiction" of this court; this assertion need not be considered.

partial summary judgment is denied and the petition is dismissed. Plaintiffs are allowed thirty (30) days from the date of this decision within which to file an amended petition asserting any claims (except those dismissed) they may have arising out of Lease Areas 1 and 2; and, absent a timely amended petition, plaintiffs' petition shall be dismissed.

## APPENDIX A

*Excerpt from General Provisions, Housing Contract*

41. Federal, State and Local Taxes (Except Real and Personal Property Taxes).

(a) As used throughout this clause, the term "contract date" means the date set for the opening of bids. As to additional construction, supplies or services procured by amendment to this Housing Contract, the term "contract date" means the date of such amendment.

(b) Except as may be otherwise provided in this Housing Contract, the contract price includes all Federal, State and local taxes and duties in effect and applicable to this Housing Contract on the contract date, except taxes from which the eligible builder or the transactions or property covered by this Housing Contract are then exempt. Duties and Federal transportation taxes are included in the contract price unless otherwise specifically excluded.

(c) (1) If the eligible builder is required to pay or bear the burden (i) of any Federal tax or duty which either was not to be included in the contract price pursuant to the requirements of paragraph (b) or was specifically excluded from the contract price by a provision of this housing contract; or (ii) of an increase in rate of any Federal tax or duty, whether or not such tax or duty was excluded from the contract price; or of any interest or penalty thereon, then in any such event the contract price shall be correspondingly increased, the increase to be processed as a change order; provided that the eligible builder warrants in writing that no amount for such tax, duty or rate increase was included in the contract price as a contingency reserve or otherwise; and further provided, that liability for such tax, duty, rate increase, interest or penalty was not incurred through the fault or negligence of the eligible builder or his failure to follow instructions of the Contracting Officer.

(2) If the eligible builder is not required to pay or bear the burden or obtains a refund or drawback, in whole or in part, of any Federal tax, duty, interest or penalty which (i) was to be included in the contract price pursuant to the requirements of paragraph (b), (ii) was included in the contract price, or (iii) was the basis of an increase in the contract price, then in any such event the contract price shall be correspondingly decreased, the decrease to be processed as a change order, or the amount of such relief, refund or drawback shall be repaid as directed by the Contracting Officer if the housing project has been determined to be completed by the Commissioner. The contract price also shall be correspondingly decreased (and in the same manner) if the eligible builder, through his fault or negligence or his failure to follow instructions of the Contracting Officer, is required to pay or bear the burden, or does not obtain a refund or drawback of any such Federal tax, duty, interest or penalty. Interest earned on refunded Federal taxes shall inure to the benefit of the Department to the extent that such interest was earned after the eligible builder was paid or reimbursed from the proceeds of the mortgage for such taxes.

(3) Invoices or vouchers covering any increase or decrease in the contract price pursuant to this paragraph (c) shall set forth the amount thereof as a separate item and shall identify the particular tax involved, and each such invoice or voucher shall be identified with the appropriate change order.

(4) Nothing in this paragraph (c) shall be applicable to social security taxes, income taxes, excess profits taxes,

capital stock taxes, transportation taxes, or any State and local taxes. (The treatment of State and local real and personal property taxes are covered in Article XIX, paragraph 33, of the Housing Contract.)

(d) The eligible builder shall promptly notify the Contracting Officer of all matters pertaining to Federal taxes that reasonably may result in either an increase or decrease in the contract price.. The eligible builder shall take action as directed by the Contracting Officer, and the contract price shall be equitably adjusted to cover the cost of such action, including any interest, penalty, and reasonable attorney's fees, such adjustment to be processed as a change order.