**NIKO CONTRACTING CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 95–424C.**

United States Court of Federal Claims.

Dec. 23, 1997.

J. Frank McKenna III, Pittsburgh, PA, for plaintiff. Kimberly J. Koerner, Pittsburgh, PA, of counsel.

Alfred S. Irving, Jr., U.S. Department of Justice, with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Joseph A. Kijewski, Assistant Director, Washington, DC, for defendant. Arnold Finlayson, Smithsonian Institution, Washington, DC, of counsel.

## OPINION

BRUGGINK, Judge.

This action, brought under the Contract Disputes Act, 41 U.S.C. §§ 601–13 (1994), arises out of a contract between the plaintiff and the Smithsonian Institution, whereby plaintiff was to replace the roof of the Cooper–Hewitt Museum in New York City. Plaintiff Niko Contracting Company (Niko) claims that, although the work is complete, Niko has not been fully compensated for all "change" work and for Government-caused delays. On May 7, 1997, the court denied defendant's motion for summary judgment without prejudice. The matter is presently before the court on the Government's renewed motion for summary judgment on all counts of the complaint. Further argument is deemed unnecessary. For the reasons expressed below, the Government's motion for summary judgment is granted.

## BACKGROUND

On September 25, 1990, the Smithsonian Institution's Office of Procurement & Property Management (Smithsonian) awarded Contract No. FC–0070020000 to the plaintiff. Under the terms of the contract, Niko was to "furnish all supervision, labor, materials, and equipment needed for the Roof Replacement of the Cooper–Hewitt Museum, located at # 2 East 91st Street, New York, New York." (Def.'s Renewed Mot. for Summ. J., app., at 1 [hereinafter Appendix].) The award to Niko, a firm-fixed-price contract in the amount of $1,586,696.00, was to "commence[ ] within 7 calendar days after receipt of the Notice to Proceed and ... [be] completed in every respect within 600 calendar days therefore." (Appendix at 3.) The contract was signed for Niko by its president, Nicholas Lardas, and for the Smithsonian by the Contracting Officer (CO), Robert Perkins.

The Government concedes that, during the performance of the contract, the contractor encountered problems with the existing roof of the museum, resulting in work that was beyond the original contract. On such occasions, Niko would forward a proposal for a change request to the Contracting Officer's Technical Representative (COTR), who would then evaluate the proposal and negotiate with the contractor to add the additional work to the contract via a contract modification. Assuming the contractor and the COTR reached an acceptable agreement, a contract modification would be drafted for Niko's signature. Once Niko accepted the terms of the modification and signed the agreement, it was forwarded to the CO for final approval and signature. Niko claims that it sent over fifty such proposal letters to the Smithsonian. The Government asserts that this number was "over thirty." It is not clear from the evidence before the court precisely how many proposal letters or individual change requests were forwarded to the COTR. However, it is clear that at least thirty-two individual change requests became the subjects of seven bilateral modifications to the contract (Modifications One, Two,

Three, Four, Five, Seven, and Eight), which increased the value of the contract to $2,179,-232.95 and also extended the completion date by approximately 319 calendar days, to April 22, 1993.[1]

Each of these seven modifications contained a release clause providing:

> In consideration of the modification agreed to herein as complete equitable adjustment for the Contractor's letter of proposal for adjustment ..., the Contractor releases the Smithsonian Institution from any and all liability under this contract for further equitable adjustment attributable to such facts or circumstances giving rise to the proposals for adjustment.

(*See, e.g.,* Appendix at 90.) In each case the date or dates of the contractor's relevant proposal letters were entered into the release provision.

The contract was accepted by the Smithsonian as substantially complete on June 3, 1993. However, negotiations over additional change requests continued for some time. Modification Nine, which covered six change request proposals, was negotiated between Niko and the COTR, was signed by Niko on October 18, 1993, but was not executed by the CO because Niko had stricken the release language. The negotiated amount was $30,332.06. On June 3, 1994, Niko submitted a claim to the CO requesting a final decision; it claimed that the contract modifications did not adequately compensate it for the change work and that it was entitled to additional payment of $1,064,391.91. On July 18, 1994, Niko submitted a revised claim in the amount of $1,131,210.25.

By written decision dated December 20, 1994, the CO denied Niko's claim in part and sustained it in part. The CO found that Niko was entitled to an equitable adjustment of $43,800.32 including interest, which represented the $30,332.06 initially addressed by the ninth contract modification along with some additional direct-cost items. The balance of the claim was denied on the basis of

---

1. Modification Six, dated April 30, 1992, modified the contract "to reduce the retainage held on progress payments from 10% to 5%, in accordance with the Contractor's letter of request dated April 28, 1992." (Appendix at 168.) This contract modification did not alter the total amount of the contract or the completion date, and is not at issue.

the releases. On December 21, 1994, the CO unilaterally executed Modification Nine.

On June 26, 1995, plaintiff filed its present claim in this court. The substance of Niko's ten-count complaint is that the contract design contained numerous defects that were not evident to the contractor prior to beginning performance, that Niko was called on to do work that was not within the original scope of the contract, and that both phenomena caused delays. Although Niko agrees that it was compensated to some degree for these delays and defects through the nine contract modifications, it alleges here, as it did to the CO, that the release clauses contained in seven of the modifications do not operate to foreclose Niko from seeking additional compensation—primarily profit and overhead—for work related to the modifications. Niko asserts that, despite the apparent effect of the release clauses,[2] it entered a separate oral agreement with the Smithsonian whereby it would be allowed to seek additional compensation for profit and overhead once an audit was performed. In the alternative, if the court views the release language of the modifications as evidence of a valid accord and satisfaction, Niko also maintains that each of the contract modifications was forced upon it by the Smithsonian's exercise of improper economic duress.

For its part, the Government relies on the release language of the first seven bilateral modifications as evidence of an accord and satisfaction on the change work at issue there. It asserts that neither the project COTRs nor the CO made any representations to Mr. Lardas that Niko would be allowed to claim additional profit and overhead on any of the eight bilateral contract modifications. The Government further claims that it did not unduly coerce Niko into signing any of the contract modifications, and that Niko was always free to refuse the proposed modification if it did not agree with the terms. In addition, the Government argues that Niko has been fully compensated for the change work addressed in Modification Nine, which was unilaterally executed by the CO after substantial completion of the contract.

The Government moved for summary judgment once before, primarily in reliance on the language of the releases. Niko responded to the earlier motion with the contentions that the releases were unenforceable either because of duress or because representations were made prior to their execution that they would not preclude the later submission of larger claims arising out of the same facts. That motion was denied without prejudice because it was unclear what the facts were with respect to those representations. The court directed Niko to prepare pretrial proposed findings of fact in order to isolate any relevant factual disputes. Niko was required to assert more specifically what statements were made and by whom. If they were not made by Mr. Perkins, the court wanted to know what Niko could show with respect to his knowledge of the representations. The court left room for the Government to reassert its motion for summary judgment if that appeared appropriate.

Niko has submitted its proposed findings, and defendant has responded to them with its renewed motion for summary judgment. The court is satisfied that, even though defendant disputes many of plaintiff's proposed findings, the premise behind its motion is correct. Even assuming that everything Niko asserts in its proposed findings is accurate, defendant is entitled to judgment as a matter of law.

## DISCUSSION

The primary claim for additional monies arises out of Niko's contention that the equitable adjustment work should not have been subject to a contract provision limiting over-

---

2. In its brief to the court, Niko alleges that the language of the release clauses is ambiguous and that it could easily be read to allow plaintiff to claim additional profit and overhead for change work otherwise addressed in the modification. This assertion is without merit. The release language of the contract closely tracks that found in the Federal Acquisition Regulations. See 48 C.F.R. § 43.204(c) (1996). The plain meaning of the release is evident on its face—that the contractor releases the Government from "any and all" liability arising out of the "facts and circumstances" that are the subject of the modification. "Any and all" includes liability for profit and overhead calculations on the change work that is the subject of the modification.

head and profit. Clause 96 of the contract provides that overhead and profit on changed work will be no more than fifteen percent of actual costs, less payroll. In its complaint, Niko made, inter alia, the following assertions:

> 25. The Government made representations to NIKO which indicated that the Modifications with Releases would not constitute an accord and satisfaction and that NIKO's claims would be addressed at a later point in time.

> 26. The Government also told NIKO that a higher percentage of [general and administrative overhead] GAO and profit, reflecting NIKO's actual GAO and profit, would be applied retroactively to all [Change Requests], including those processed into Modifications after an audit was conducted.

(Compl. ¶¶ 25–26.) These two paragraphs contain an implicit common assertion, namely, that the releases are unenforceable. There is a substantive difference between them, however. Even if paragraph 25 could be established, i.e., that the Government was precluded from reliance on the releases, Niko would not recover. The releases are unnecessary to the Government's defense if the contract language, which limits overhead and profit, still controls. Niko only succeeds, in other words, if paragraph 26 is correct in substance, i.e., that someone with authority to bind the Government changed the contract limitation and promised to pay Niko at the higher overhead and profit rates irrespective of clause 96.

Niko's proposed findings of fact substantially narrow the factual dispute. Niko claims essentially that two types of representations were made by the Smithsonian regarding each of the seven contract modifications containing releases. First, the con-

tractor asserts that the COTRs informed it that the release language in the modifications would not preclude Niko from later claiming additional amounts for profit and overhead. Second, Niko claims that the COTRs informed it that, if the modifications were not executed by Niko, no payments would be made for the change work that had already been performed until a full audit was conducted. The latter contention supports its assertion of coercion.

### A. Effect of Misrepresentation on the Release Language

Under the terms of the contract, the COTR acts as the CO's "exclusive representative to the Contractor with respect to the Project during construction and until Final Payment and Release of Claims." (Contract ¶ 2.) The contract gives the COTR "full authority to act on behalf of the ... [CO] with regard to all aspects of the Project...." (Id.) However, this authority is expressly limited in that the CO "must approve all Modifications and payment to the Contractor and is the final authority for all disputes under any clause of th[e] contract."[3] (Id.) Here, Niko claims that the COTRs orally agreed to allow Niko to supplement its claims for profit and overhead on change work.[4]

The specifics in Niko's most recent proposed findings are as follows. Nicholas Lardas, Niko's president, asserts in his affidavit that on November 14 and 20, 1991, Loren Raap told him that if Niko agreed for the time being to use the Smithsonian's rates on modifications, Niko could pursue its claims for higher equipment rates, higher labor burden, and higher GAO and profit once the work was completed. Mr. Lardas also avers that from June to November, 1991, David Evans made representations to the effect

---

3. The authority of the COTR is further limited by the "designation of authority" issued to the COTR by the Smithsonian, which provides that "[t]he COTR is not authorized and shall not enter or execute any contract modifications involving a Supplemental Agreement to the Contract; nor shall he otherwise effect a divestiture of the Smithsonian Institution's rights under any of the clauses of the contract...." (Appendix at 78.)

4. At any given time there was only one COTR designated on the project. This position was filled by David Evans from September 25, 1990, until November 18, 1991, and by William Raczko from "mid-November" 1991 until the completion of the project in July 1993. For a short period during the transition between Mr. Evans and Mr. Raczko, Loren Raap, the former chief of construction for the Smithsonian's Office of Design and Construction, acted as the COTR.

that the Government would adjust rates if they turned out to be too low. Evans himself admits that he might have told Lardas that the rates used on the modifications might be changed by the contracting office after an audit.[5] Niko's contentions are adequately supported, and the court will assume them to be correct.

It is worth noting that the representations were all made well after September 1990, when the contract was executed. There is no contention, in other words, that the parties' understanding of clause 96 would have been any different at the time of contract execution than the words of the contract themselves would suggest. The representations from the COTRs were made later in connection with the requests for modifications as problems developed in the work.

As the CO, Mr. Perkins had authority to modify the contract in the way Niko requested. There is no question, however, that he made no such modification in writing. Nor is there an assertion that he made such a modification orally. Indeed, Niko asserts that Mr. Lardas never spoke with Mr. Perkins, who was stationed in Washington, D.C. More importantly, there is no assertion that he knew of any of the statements made by the COTRs. It follows that any representation by the COTRs that Niko could ask for costs beyond those allowed in the contract, much less that it would be paid such higher rates, would, therefore, have been at odds with the limitations contained in clause 96 and were not endorsed by Mr. Perkins.

The correspondence between Mr. Lardas and Mr. Perkins strongly suggests that the CO intended to apply the contract limitations throughout. The correspondence from Mr. Lardas also does not contain any assertion to the effect that he had been assured by the COTRs that his company would be able to either ignore the releases or otherwise assert additional costs at a later date. On June 11, 1991, Mr. Lardas wrote Stephen Foster, the Assistant Contracting Officer, for permission to "include field superintencence [sic] and labor burden in the direct costs, and calculate

overhead at 21% of the direct costs." He wrote a similar letter the next day. He received a response from Mr. Perkins on June 26, 1991, stating in unequivocal terms that all change order pricing would be done in accordance with the contract limitations.

Mr. Lardas iterated his request in a June 28, 1991, letter. He recites in it that he had not addressed earlier the issue of the limitation on profit and overhead because he assumed, based on modifications on prior contracts, that he would be able to obtain a similar reprieve. Mr. Perkins' July 9, 1991, response is, once again, unequivocal: "[Y]our 'request that the markup on change orders be changed to 21% for overhead and 10% for profit' is denied."

A July 23, 1991, letter from Mr. Lardas to David Evans refers to his request for changing overhead and profit as still pending with the CO. Another letter to Mr. Evans, dated October 23, 1991. It includes a cost breakdown for changed work utilizes the fifteen-percent limitation of the contract without suggesting that the figure had been altered by agreement. It is representative of many other such letters. In fact, throughout this period, Niko executed modifications in which the contract limitation was used to price change work and in which it gave up the right to assert further claims.

 It is an oft-cited principle of government-contract law that a contractor who relies on the representations of a government official acting without authority does so at its peril. *See Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). Assuming that the COTRs represented to Niko that the release clauses could be ignored, they acted outside their contractually delegated authority. The releases were part of the contract between the parties and only the CO could alter them on behalf of the Government. There is absolutely no evidence that Mr. Perkins agreed to such an alteration himself or knew of or acquiesced in representations to that effect by the COTR's. The present facts, therefore, are distinguish-

---

5. He also testified that he never assured Niko that it *would* be compensated at the higher rates, although the court will assume he did.

able, for example, from *Narva Harris Construction v. United States*, 216 Ct.Cl. 238, 574 F.2d 508 (1978), in which an oral modification was allegedly made by the CO; from *George H. Whike Construction v. United States*, 135 Ct.Cl. 126, 140 F.Supp. 560 (1956), in which there was significant evidence of involvement by the CO; and from *C & H Commercial Contractors v. United States*, 35 Fed.Cl. 246 (1996), in which the government officials involved in making misrepresentations to a contractor about the legal effects of a release clause had actual authority to modify the contract.

■ It follows that, even taking at face value Niko's fact assertions with respect to the representations made by the COTRs, its contention that the bilateral modifications it signed did not act to release the Government from further liability for the related change work must fail. The releases remain an obstacle to the assertion of any further claim arising out of the seven modifications containing such release language.

Moreover, even assuming that the COTR's representations concerning the releases were binding on the agency, Niko's more fundamental problem is that a promise *to consider* a claim implies no obligation *to pay* it. The contract would remain as an impediment to Niko's request for additional money for profit and overhead unless a promise was made to ignore, not just the releases, but clause 96. While Niko alleges that such a promise was made, it too was made only by the COTRs, not by the CO,[6] and thus has no legal effect.

### B. *Coercion by Economic Duress*

Niko's second assertion is that the COTRs, acting on behalf of the CO, unlawfully coerced Niko into signing the contract modifications at issue. Niko contends that it was told that the only way it could keep monies flowing to the contract for this substantial change work was to agree to the modifications and hence the releases. Somewhat inconsistently, it also asserts, as discussed above, that it relied on the COTRs representations that the releases were not binding. It contends that, if the COTR representations are not binding, they constituted misrepresentations and hence vitiated Niko's consent to the releases.

With respect to both arguments, once again, the contractor faces the problem that, if the court were to hold that the releases are unenforceable either as having been illegally coerced or as not representing the parties actual understandings, Niko would still confront the presumptive limitation on additional charges contained in the contract itself. As explained above, the Government does not have to rely on the releases because the contract controls the result.[7] In any event, the court finds that Niko's consent was not vitiated either by coercion or misrepresentation.

The latter point is easily disposed. Niko relies on *C & H Commercial Contractors*, for the proposition that misrepresentation vitiates consent. *See* 35 Fed.Cl. at 256. As explained above, however, that case involved representations by persons with contracting authority. The court ruled that if a party's assent is induced "'by either a fraudulent or material misrepresentation by the other party *upon which the recipient is justified in relying*,'" the release is voidable. *Id.* (emphasis added) (quoting *Restatement (Second) of Contracts* § 164(1) (1979)). The emphasized language in the quoted excerpt is critical. Niko was not justified in relying on the COTRs' representations here because they were squarely in contradiction to the contract and because the contractor is assumed to

---

6. The court is sympathetic with the contractor in respect to its difficulties in dealing with the Smithsonian. The agency apparently maintains a highly centralized contracting authority. Forcing the contractor to deal with local COTRs, who have extensive responsibility but little authority, is a recipe for misunderstanding, particularly if the COTRs are promiscuous in making representations.

7. The court rejects the assertion made at oral argument that the contract limitations are unenforceable because the work necessitated either by unexpected circumstance or change orders constituted a cardinal change beyond the scope of the original contract. Niko or other bidders could have anticipated all the change work under the original contract. Nothing appears in the record that is not closely related to refurbishing the roof on the museum.

have knowledge of the limitations on their authority.

With respect to the issue of coercion, Niko contends that, due to its relatively small size, the significant increase in unexpected work, and the agency's threats to conduct an audit if Niko would not agree to the contract-limited cost calculations, its agreement to the releases was void. Its argument, in short, is economic duress, illegally brought to bear.

 The specifics of the duress argument fall short of making the necessary showing. Niko is correct that, under unique circumstances, economic duress can vitiate consent.[8] With one exception, an essential ingredient is coercion through extra-contractual means. *See Liebherr Crane Corp. v. United States*, 810 F.2d 1153, 1158 (Fed.Cir. 1987); *McLain Plumbing & Elec. Serv., Inc. v. United States*, 30 Fed.Cl. 70, 82–83 (1996). While no governmental official has the authority to use unlawful means to coerce a contractor to take actions against the contractor's wishes, the Government is not precluded from using influence that is within the bounds of the contract to effect its goals. In other words, the Government may freely exercise its legitimate powers to enforce the provisions of the contract. In this case, the agency was within its rights under the contract both in insisting on performance of the change work and on withholding disputed amounts until they could be audited.

 It is true that "[a]n act the Government is empowered to take under law, regulation, or contract may nonetheless support a claim of duress if the act violates notions of fair dealing by virtue of its coercive effect." *Systems Technology Assocs. v. United States*, 699 F.2d 1383, 1387–88 (Fed.Cir.

1983); *see Liebherr Crane Corp.*, 810 F.2d at 1158. The court rules, however, that as a matter of law the facts asserted do not rise to the level of improper duress. There is no credible support for the assertion that the agency intentionally withheld undisputed contract amounts in order to disable Niko and induce it to sign the releases. The delays between requests for payment and payment on undisputed amounts were not excessive. The agency ultimately paid nearly $600,000 more than the original contracted amount and did so on a regular basis, making twenty-six payments over a two-year period. It is only those amounts that Niko now disputes, in contravention of the releases, that have not been made.

Defendant seeks summary judgment on the entire claim, including Niko's assertion that it was underpaid on the work negotiated in connection with Modification Nine. Defendant simply recites that it paid everything that Niko was entitled to under that modification. The evidence on this point is admittedly sparse. Niko contested defendant's proposed finding that Modification Nine was unilaterally executed by the CO on December 21, 1994, saying that the evidence did not support that finding. This refusal to stipulate was baseless. A copy of the executed modification appears in the appendix to defendant's initial motion for summary judgment. In any event, a modification does not have to be signed by both parties. Mr. Lardas also executed a copy of the same modification, marking through the release language, on October 18, 1993. Defendant has asserted, without meaningful contradiction,[9] that the final decision paid the

---

8. To show economic duress, the contractor must show that: (1) some wrong committed by the Government caused the contractor's distress; and (2) the Government exploited that distress to obtain an unjustified advantage. *See Rixon Elec., Inc. v. United States*, 210 Ct.Cl. 309, 313–14, 536 F.2d 1345, 1348 (1976); *Peters v. United States*, 694 F.2d 687, 694 (Fed.Cir.1982). Under the facts of this case, the court finds no evidence that the Smithsonian "caused" the financial condition allegedly encountered by the contractor. Indeed, the plaintiff does not allege that its financial condition was caused by the Government, only that the Government knew of and

took advantage of the condition to influence the modifications. "[T]he mere stress of business conditions will not constitute duress where the defendant was not responsible for those circumstances." *Fruhauf Southwest Garment Co. v. United States*, 126 Ct.Cl. 51, 62, 111 F.Supp. 945, 951 (1953); *see also Inland Empire Builders, Inc. v. United States*, 191 Ct.Cl. 742, 753, 424 F.2d 1370, 1376–77 (1970) (quoting *Fruhauf*).

9. Niko purported to dispute this finding (Defendant's Proposed Finding No. 142) by referring the court to the final decision itself.

amount set forth on both signed versions of Modification Nine.

Niko's only dispute with the defendant's contention that it is owed no more on Modification Nine is the assertion that it is not affected by the releases contained in the other modifications. Defendant does not need a release, however, unless the contractor can explain why the payment in full of the modification does not satisfy the contractor's demand. The only explanation as to why there is more money owed is the contention that "the Smithsonian failed to compensate NIKO for additional overhead and profit." (Pl.'s Br. of 9/23/97 at 31.) This ubiquitous contention fails, ultimately, for the same reasons it fails in connection with the other modifications—the parties entered into an agreement that specified how Niko would be paid for change work. The agency was not in error in insisting on adherence to that contract formula.

## CONCLUSION

The facts asserted by the contractor preclude relief. Accordingly, defendant is entitled to judgment as a matter of law. The Clerk is directed to dismiss the complaint. No costs.