METRIC CONSTRUCTION CO., INC.

v.

The UNITED STATES.

No. 647–81C.

United States Claims Court.

Feb. 8, 1983.

384

Wade R. Dann, Seattle, Wash., for plaintiff; Shawana Ryan, Seattle, Wash., of counsel.

Kathleen A. Flynn, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

LYDON, Judge:

In this "direct access" construction contract case, filed pursuant to Section 10(a) of the Contract Disputes Act of 1978, 41 U.S.C. Sec. 609(a)(1) (Supp. V 1981) (CDA), plaintiff seeks to recover a fee it paid, or is required to pay, to a third party indemnitor of a surety company which, it is alleged, agreed to issue required performance and payment bonds on the strength of said indemnity agreement, in connection with plaintiff's bid and subsequent award of a contract by the Department of the Navy, Naval Facilities Engineering Command (NFEC). Plaintiff's position is that as a result of authorized and approved change orders and attendant modifications the original contract price was increased by $9,603,274. Under the indemnity agreement referred to above, plaintiff maintains it was obligated to pay to the third party indemnitor a fee of 7.5 percent of this increased contract price, or $720,245, as part of its bonding responsibilities under the contract. Defendant denies that plaintiff is entitled to recover this fee. Both parties have moved for summary judgment. For reasons discussed hereinafter, neither party has established a right to summary judgment.

## I.

On February 15, 1980, plaintiff was awarded a contract by NFEC to perform maintenance and repair work on family housing at the Naval Air Station, Lemoore, California. The contract price was $36,152,000. The contract contained the standard clauses generally found in military construction contracts, e.g., "Changes," "Disputes" and bonding requirements as required by statute, the so-called "Miller Act," 40 U.S.C. Sec. 270a (1976). The contractor in this case at the time of award was required to "furnish a performance bond in the sum of $36,152,000 and a payment bond in the sum of $2,500,000." Under applicable Defense Acquisition Regulations (DAR), 32 C.F.R. Sec. 10–103.1(b) (1981), additional performance bond protection was required of the contractor, in connection with any contract modification effecting an increase in the contract price. DAR Sec. 10–103.1(c) further provided: "In making allowance for bond premium in equitable adjustments or other price modifications affecting contracts, the allowance shall not be more than that calculated at the rate paid for the bonds furnished under the original contract."

Prior to bidding on the Lemoore contract, at issue in this case, plaintiff was a newly formed California corporation, having been organized on December 24, 1979. Its president, Tom Miller, had 9 years of experience as a construction manager for the Quiller Construction Company, Inc. The Quiller Construction Company had 30 years' experience in the construction business and its president for those 30 years was Frank Miller, Tom Miller's father. When Tom Miller established his own company, Frank Miller advised his son to discuss bidding on any government projects with him beforehand and assured his son he would assist him in every way possible to make his "new venture successful."[1]

Plaintiff alleges that prior to bidding on the Lemoore contract, Tom Miller, on behalf of his company, contacted a surety company, United Pacific Insurance Company (UPIC) to obtain performance and payment bonds required by the contract.

---

[1] In a letter to his son dated January 20, 1980, Frank Miller briefly outlined his verbal agreements with his son. For example, the father allowed the son to utilize key personnel that supervised a Navajo housing project—a contract ostensibly performed by the Quiller Construction Company, and facilities he had that the son may need at 20 percent under prevailing rental rates. The father also agreed to serve as a consultant to his son for a fee of $50.00 per hour, and agreed to make funds available to the son at one point over current bank interest rates. The father, however, cautioned his son that he did not expect to counsel with him on a daily basis, but would make himself available upon reasonable notice.

Plaintiff further alleges that since it was a new construction company and had not yet proven its financial and performance capabilities, UPIC refused its bonding request. UPIC, however, plaintiff alleges, advised Tom Miller that because of its lack of capital qualifications for a job of this dollar size, plaintiff would have to provide a qualified surety indemnifier if it wished to obtain bonding, and suggested Frank Miller as a possible surety indemnitor since he was an existing client of UPIC, and had the necessary financial strength and the construction experience, technical and otherwise, relative to the type of work required by the Lemoore contract.

At the suggestion of UPIC, Tom Miller, plaintiff alleges, contacted Frank Miller d/b/a Procedures Company requesting that the Procedures Company serve as an indemnitor for UPIC relative to the issuance of performance and payment bonds to plaintiff for the Lemoore contract. On January 17, 1980, the Procedures Company executed an indemnification agreement with UPIC in connection with plaintiff's bidding on the Lemoore contract.[2] In turn, on January 18, 1980, plaintiff, acting through Tom Miller, entered into an agreement with Procedures Company, acting through Frank Miller, which provided in pertinent part as follows:

1. We [plaintiff herein] agree to pay you [Procedures Company] an indemnification fee of seven and one-half (7½) percent of the gross amount of contract price: the final contract price to be adjusted by any authorized changes issued by the Owner and the indemnification fee is to be adjusted accordingly.

2. Your fee will be payable to you within 180 days of the receipt of progress payments on the Contract by Metric at the rate of seven and one-half (7½) percent of such progress payments. However, any unpaid balance is due and payable out of the final payment received by Metric from the owner.

Plaintiff as the low bidder on the Lemoore contract requested a conference with Navy contract officials on February 5, 1980. At this conference, Tom Miller explained that plaintiff was newly formed and was heavily dependent on the assistance of Frank Miller and his company, Quiller Construction Company, in the areas of consultation, personnel and financial support. Frank Miller, who attended the conference, stated that he had committed himself to giving full assistance to his son as evidenced by their January 20, 1980 agreement which he produced at that time and which was discussed previously. A memorandum of this February 5, 1980 conference, prepared by a Navy contract specialist, stated in pertinent part:

4. Mr. Robert Boyd, the bonding agent for Metric Construction Co.'s bid bond, then stated that he has bonded Quiller Construction for thirty years and has known Tom during that time and based on his dealings and their agreement of 20 January 1980, unequivocally guarantees that United Pacific Reliance Ins. Co. will issue full payment and performance bonds for Metric Construction Co.

5. Mr. Tom Miller then proceeded to explain his approach to the project. He stated that he will fully utilize his father and Robert D. Dunham as consultants, Dick Hitchcock and Sid Pehrson for supervisor, and experience labor crews which have been working exclusively for Quiller Construction * * * * *.

\* \* \* \* \* \*

7. The AROICC noted to the Board that personnel of Quiller Construction were the most active contractor at the site during the pre-bid period and that they impressed him with their thoroughness.

\* \* \* \* \* \*

2. The materials presently before the court do not provide any information on the Procedures Company. A letter dated December 8, 1980, from UPIC to the Department of Navy stated that UPIC advised Frank Miller in January 1980 that the execution of such an indemnity agreement "would in turn restrict UPIC's ability to provide surety credit for Frank Miller or his firm in a like total construction dollar amount."

NOTE: Subsequent to the meeting the Construction Division expressed their feeling that based on previous history Quiller Construction Company is a responsible contractor. Also, by enclosure (2), Mr. Ruccola states that Mr. Hitchcock and Mr. Pehrson are, based on current WESTDIV contract performance, satisfactory personnel for the supervision of subject project.

As indicated previously, plaintiff was awarded the Lemoore contract on February 15, 1980. There were four corporate sureties that provided full coverage under the performance and payment bonds required by the Lemoore contract.[3]

During contract performance, the Navy issued a number of change orders which increased the original contract price. These change orders had to receive the consent of all four sureties mentioned in note 3, *supra.* Further, some of the large change orders, undoubtedly required an audit of the contractor's proposal. It would appear, although it is not entirely clear from the materials supplied by the parties that, presumably, during the course of the first audit of a large change order proposal, the Navy auditor discovered that the plaintiff's proposed home office overhead costs were based on an estimate of 12 percent of direct costs including subcontracts. In a review of plaintiff's actual overhead from inception of the company through August 31, 1980, the Navy auditor learned that plaintiff's proposed home office overhead included approximately $148,232 for performance bond indemnification fee. The auditor, in his report, stated: "The contractor did not provide any basis to support the reasonableness or allocability of the indemnity costs; nor do we have any basis to question the costs. Therefore, we express no opinion on the acceptability of the costs."

At some period after this audit, on a date that cannot be determined on the basis of the materials presently before the court, plaintiff and the Navy "locked horns" on the allowability of surety indemnification costs. On December 8, 1980, UPIC wrote to the Navy setting out the circumstances relating to the issuance of bonding to plaintiff for the Lemoore contract and the necessity for surety indemnification before it would issue such bonding to plaintiff. On the same day, an insurance brokerage firm, Booth and Simpson, wrote the Navy on plaintiff's behalf attesting to the propriety of the surety indemnification procedure in this case and the reasonableness of the fee involved.

On March 25, 1981, plaintiff wrote to the Navy in pertinent part as follows:

We are in receipt of the Minutes of the Board on Changes dated 9 February 1981 (and 24 February 1981) with respect to which we seek to reserve our rights to a claim for the 7½% indemnity costs for which we are responsible to the indemnitor of the bond under subject contract. We have received a copy of the Government's audit report and remain of the view that we are entitled to recovery of the 7½% indemnity cost which is not included in the amounts of settlement. Please advise whether the Minutes are to be revised to reflect our reservation of this claim or whether this letter serves as a reservation of the claim. We request that the contract modification document shall reserve this claim for later resolution or negotiations.

\* \* \* \* \* \*

We are prepared to sign the minutes of the Board on Changes subject to the reservation of our claim referenced above.

On April 7, 1981, plaintiff, in submitting its claim for payment of the surety indemnification fee to the contracting officer, stated in pertinent part:

**3.** The Performance Bond for this contract was executed by the following four sureties, with their liability limits in parenthesis: United Pacific Insurance Company (UPIC) ($3,976,720); Reliance Insurance Company ($25,306,400); Employers Reinsurance Corporation ($3,976,720); and North American Reinsurance Corp.

($2,892,160). The contract indicated that the surety bond premium (Rate Per Thousand) was $9.00 first $500,000; $6.00 next 2 MM; $5.00 next 2.5 MM; $4.50 next 2.5 mm; $4.00 over $7,500,000. The total bond premium for the original contract price of $36,152,000 was $154,858.

In this letter we are summarizing our claim for payment of the 7½% indemnity fee which we are incurring in conjunction with change orders or other contract modifications pursuant to the agreement dated January 18, 1980 (a copy of which is enclosed) between Procedures Co. (Frank Miller) and Metric Construction Co., Inc. This claim has not been included within the equitable price adjustments negotiated between the Government and us and is reserved as a pending claim.

\* \* \* \* \* \*

The fees payable by us to Frank Miller for his personal indemnity are frequently incurred by construction firms such as ours and represents an ordinary and necessary cost of business. Reference is made to the letter dated December 8, 1980 from Booth and Simpson, surety bond brokers, a copy of which is enclosed, that recognizes that fees payable to the third party indemnitor are reasonable business practices in the experience of that firm which serves clients in the construction industry.

\* \* \* \* \* \*

We are enclosing the letter dated December 8, 1980 from United Pacific Insurance Company addressed to the Government relating to the obtaining of the surety bond and the requirement of the surety for the personal indemnity of Frank Miller.

Our claim for Government payment of the indemnity fees does not pertain to the original bond issued under the original scope of the construction contract based upon our bid price; rather our claim relates to the increases in the amount of indemnity fees payable by us to Frank Miller (Procedures Co.) because of changes and other contract modifications issued by the Government.

\* \* \* \* \* \*

In view of the foregoing, we are entitled to recognition of the indemnity fees that we are incurring to Procedures Co. (Frank Miller) with respect to the adjustment of the contract price for changes or other contract modifications. Such costs are to be included within equitable price adjustments of our contract, which to date have been included by the Government.

Pursuant to the Contract Disputes Act of 1976, we are certifying this claim for which we are requesting the Government payment of the indemnity fees related to changes or other contract modifications together with interest thereon at the applicable rate of the Department of the Treasury.

Attached to plaintiff's April 7, 1981 claim letter was a "Certification Of Claim" which was signed by Tom Miller as president of plaintiff, dated April 7, 1981, and which read as follows:

I certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; and that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable.

On July 21, 1981, the contracting officer, "[a]fter a careful review of the documents presented \* \* \*" denied plaintiff's claim on the ground that "since the 7½% indemnity fee is not reasonable it is not allowable." This determination by the contracting officer was labeled "Final Decision # 81–126." Indeed, in his July 21, 1981 decision, plaintiff was advised that, "[t]his is the Final Decision of the Contracting Officer," and notified of its administrative appeal rights.

On November 5, 1981 plaintiff filed suit in this court seeking recovery of the surety indemnification fee cost it allegedly incurred in connection with its performance of the Lemoore contract.

II

Applicable regulations provide in pertinent part as follows:

(b) Costs of bonding required pursuant to the terms of the contract are allowable.

(c) Costs of bonding required by the contractor in the general conduct of his business are allowable to the extent that

such bonding is in accordance with sound business practice and the rates and premiums are reasonable under the circumstances. [DAR 32 C.F.R. Sec. 15–205.4 (1981).]

Plaintiff's argument is that the surety indemnification fee in issue is embraced within the language "bonding required by the contract." As a result, plaintiff contends, it is an allowable cost and thus should have been paid by the Navy. Plaintiff explains that the Lemoore contract required bonding; that plaintiff was unable to get bonding without surety indemnification; and since plaintiff had to pay a fee to obtain the required indemnification necessary to obtain the required bonding, the costs, fee and bond premiums are properly considered "costs of bonding required pursuant to the terms of the contract" and thus are allowable under the controlling contract cost principles and procedures set forth in the regulations.

Defendant offers a number of defenses to plaintiff's complaint and claim. First, defendant maintains plaintiff failed to properly certify its claim as required by Section 6(c)(1) of the CDA, 41 U.S.C. Sec. 605(c)(1) (Supp. V 1981) and the court is, as a result, without jurisdiction over plaintiff's claim, citing *Skelly and Loy v. United States,* 231 Ct.Cl. ——, 685 F.2d 414 (1982); *W.H. Moseley Co. v. United States,* 230 Ct.Cl. ——, 677 F.2d 850 (1982); and *Paul E. Lehman, Inc. v. United States,* 230 Ct.Cl. ——, 673 F.2d 352 (1982). Second, defendant asserts that the portion of plaintiff's claim that accrued after July 21, 1981, the date of contracting officers Final Decision, cannot be within the jurisdiction of the court because they were not the subject of a final decision by the contracting officer, citing *Paragon Energy Corp. v. United States,* 227 Ct.Cl. 176, 176, 177, 645 F.2d 966, 967 (1981). Third, defendant claims plaintiff waived any right to seek reimbursement for indemnity fees associated with amounts resulting from contract modifications which plaintiff executed without reservation or notice of its claim for such an indemnity fee, citing *Cannon Construction Co. v. United States,* 162 Ct.Cl. 94, 319 F.2d 173 (1963). Fourth, and final-

ly, defendant argues that the surety indemnification cost for which claim is made is not recoverable in any event because said cost is unreasonable, and is otherwise not properly a cost that should be the subject of reimbursement.

### A. *Certification*

The contract in issue in this case is subject to the CDA, *supra.* The CDA section under consideration provides in pertinent part as follows:

> For claims of more than $50,000, the contractor certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable. [41 U.S.C. Sec. 605(c)(1).]

The certification requirement set forth above has proved most troublesome, and has generated, in a short time, considerable litigation in both administrative and judicial forums. It continues to prove troublesome in the case at bar.

The purpose of the certification requirement, *supra,* is to encourage fair and equitable settlement of claims and to discourage the unwarranted submission of undocumented and/or inflated contractor claims. The legislative history of the CDA confirms this statement. *See* S.Rep. No. 1118, 95th Cong., 2d Sess., *reprinted in* 1978 *U.S.Code Cong. & Ad.News,* 5235, 5241–42. It has been noted that the intent of the Act is frustrated when the claim to be certified is qualified or uncertain to the point that it is not determinable and thus effectively precludes any meaningful consideration of the claim by the contracting officer. *See Harnischfeger Corp.,* ASBCA No. 23918, 24733, 80–2 BCA Para. 14,541 at 71,679.

It is established that proper certification of a claim to the contracting officer is a prerequisite to suit in this court, as it was in its predecessor court, relative to contract claims subject to the CDA. In considering the certification requirement, the Court of Claims has uniformly held that, to properly

certify a claim, a contractor must, in its claim to the contracting officer, make a written statement that simultaneously sets forth all the assertions required by Section 605(c)(1). *Arlington Alliance, Ltd. v. United States,* 231 Ct.Cl. ——, 685 F.2d 1353 (1982); *Skelly and Loy, v. United States, supra; W.H. Moseley Co. v. United States, supra; Paul E. Lehman, Inc. v. United States, supra.* In this case, it is clear that plaintiff included such a simultaneous statement signed by plaintiff's president, which accompanied the claim it submitted to the contracting officer. This statement, as written, complied completely with the requirements of Section 605(c)(1). Thus, plaintiff's certification falls within the pale of the holdings of the above Court of Claims decisions. Defendant, however, seeks to enlarge on these holdings by further expanding on two of the three assertions required by Section 605(c)(1).

█ As to the certification requirements set forth in Section 605(c)(1), *supra,* it is not disputed that plaintiff's claim was made in good faith. Defendant does argue, however, that plaintiff has failed to meet the accurate and complete supporting data requirement of Section 605(c)(1) and has also failed to set forth the amount of its claim.

In its claim letter of April 7, 1981, plaintiff enclosed in support of its contention that it was entitled to reimbursement of 7.5 percent of all change order modifications which increased the original contract price: (1) a copy of the executed indemnity agreement dated January 18, 1980 between plaintiff and Procedures Co. whereby plaintiff agreed to pay the Procedures Co., as a surety indemnification fee, 7.5 percent of the amount of any increase in the contract's original price as a result of authorized and approved contract modifications (*see* p. 386, *supra*); (2) a copy of a December 8, 1980 letter to the Navy from UPIC summarizing the "standard underwriting requirements" imposed on plaintiff and indicating that bonding would not have been made available to plaintiff unless an accepted surety indemnity agreement had been executed by plaintiff (*see* page 386,

note 2, *supra* ); and (3) a copy of a December 8, 1980 letter to the Navy from Booth and Simpson attesting to the propriety of the surety indemnification procedure and the reasonableness of the 7.5 percent indemnification fee.

Defendant first argues that plaintiff failed to submit complete supporting data because it did not submit to the contracting officer a copy of the indemnity agreement of January 17, 1980 between Frank Miller or Procedures Co. and UPIC which was referred to in the January 18, 1980 indemnity agreement between plaintiff and Procedures Co. However, the documents attached to defendant's motion for summary judgment show that copies of the executed performance and payment bonds, to which was attached a copy of an indemnity agreement between Frank Miller and UPIC, were received by the contracting officer on February 22, 1980. Quite apart from this fact, it would not be unreasonable, on the basis of materials presently before the court, to conclude, in any event, that the contracting officer was aware on April 7, 1980, that Frank Miller or Procedures Co. was standing behind plaintiff as a surety indemnitor. Thus, it would not be fatal to the certification requirement even if the contracting officer had not received such a document as an enclosure to the April 7, 1980 claim letter.

Defendant's suggestion that the certification plaintiff submitted was defective because plaintiff did not attach copies of all the change order modifications to its claim as supporting data is without merit. The contracting officer already had copies of said change order modifications, and, as indicated *infra,* had totaled all of the executed modifications as of the date of his decision. Plaintiff should not be faulted for not encumbering its claim with materials which the contracting officer already had and the significance of which, in relation to the claim presented, undoubtedly was already known to him.

Finally, defendant asserts that plaintiff did not attach to its claim letter any documentation showing payment to Procedures

Co. or Frank Miller of the fee in question which would indicate that plaintiff was obligated to make such payments. However, Navy audit reports, of which the contracting officer was most probably aware and one of which was attached to defendant's summary judgment motion, show that plaintiff was in fact making indemnity fee payments. Defendant suggests that plaintiff should have submitted income tax records of Frank Miller or Procedures Co., or cancelled checks from plaintiff to Frank Miller or Procedures Co. showing payment of the indemnification fee. There is nothing presented by defendant which warrants considering the absence of such documentation a fatal flaw in the certification process.

Defendant's supporting data argument does justify this observation. The certification requirement was not intended, nor should it be so construed, to require a full evidentiary presentation before the contracting officer, which is what defendant, in essence, proposes should be required of the contractor herein. The contracting officer did not, as defendant suggests, deny the claim for lack of supporting documentation. As is manifest by the contracting officer's decision, the supporting data did assist him in making a meaningful determination on the dispute before him. It is concluded, given the nature of the claim in this case, that the indemnity agreement between Frank Miller or Procedures Co. and plaintiff, dated January 18, 1980 created, for purposes of certification, a binding legal obligation on the part of plaintiff and, together with the other submitted documents,

thus constituted sufficient supporting data, under existing circumstances, for certification purposes.

As a second string to its defensive bow, defendant contends that plaintiff's certification was defective because its claim letter failed to state a sum certain as the amount it sought to recover. Defendant concedes that no Court of Claims case has dealt with this point. Defendant does, however, cite several administrative board decisions which it argues support its position.

■ In setting forth its claim, the contractor is required to certify that the "amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable." 41 U.S.C. Sec. 605(c)(1). Generally, in most contract cases this means the total dollar recovery the contractor wants to obtain, since the total recovery is the bottom line of the dispute between the parties. Many factors, some of which are, or will be disputed, can underscore this amount. Accordingly, in contract claims asserted administratively, the amount claimed must be stated in a manner which allows for reasonable determination of the recovery available at the time the claim is presented and/or decided by the contracting officer.[4]

■ In this case, as opposed to the circumstances present in the Board decisions relied on by defendant, the dispute centers on whether a surety indemnification fee is a proper element of a change order modification equitable adjustment.[5] There is no

---

4. It has been noted that "[e]ven after a certification has been submitted, a contractor is not precluded from changing the amount of the claim or producing additional data. The only requirements are that the contractor certify to the amount he then honestly believes is due and that the data furnished at the time are accurate and complete to the best of his knowledge and belief * * *." *Newell Clothing Co.* ASBCA No. 24482, 80–2 BCA Para 14,774 at p. 72,916.

5. In the Board decisions relied on by defendant, the contracting officer was left unable to intelligently and confidently evaluate the presented claims because the amount of the claims asserted were uncertain, ambiguous or undeter-

minable. *See Newell Clothing Co., supra; Harnischfeger Corp.,* ASBCA No. 23918, 80–2 BCA Para. 14,541; *Summit Contractors,* AGBCA No. 81–136–1, 81–1 BCA Para. 14,872; and *Sea Con Corp.,* AGBCA No. 81–204–1 81–2 BCA Para. 15,316. For example, in *Newell Clothing Co., supra,* the contractor initially stated its claim broadly and later sought to have the claim ignored thus casting doubt on the integrity of its claimed amount (80–2 BCA Para. 14,774 at p. 72,913 and p. 72,916); in *Harnischfeger Corp., supra,* the contractor predicated the amount of its claim on a condition subsequent, *i.e.,* "as amended according to proof at trial." (80–2 BCA Para. 14,541 at p. 71,679); in *Summnit Contractors, supra,* the contractor admitted that he did not know the extent of its

dispute between the parties as to the amount of the change order modifications to which the fee would be applicable. The fee matter was the basic dispute between the parties. If the fee were agreed to, the amount of the claim would be easily determinable by the contracting officer since it would be a matter of simple arithmetic. Under these circumstances, assuming the propriety of the fee, the "amount" in dispute in this case can reasonably be deemed to be the "amount" of the fee. Further, and more importantly, the decision of the contracting officer on the fee issue would be dispositive of all contract fee claims, past, present and future. As a result, plaintiff in his claim presentation certified that the amount requested, i.e., 7.5 percent of all contract change order modification amounts "accurately reflects the contract adjustment for which the contractor believes the Government liable." Such a certification, given the nature of the claim, reasonably meets the requirements of Section 605(c)(1), supra.

The dollar amount of the accrued claims as of the date the contracting officer rendered his decision was easily determinable by the contracting officer at the time he rendered his decision. In his July 21, 1981 decision, the contracting officer noted that as of the date of his decision the total amount of all executed (i.e. signed) change order modifications was $2,803,124. Thus, plaintiff's claim at that time was, by simple arithmetic, $210,234.20 (7.5% × $2,803,124). Since the claim was determinable at the

time of certification, the "amount" required was met in any event. See Harnischfeger Corp., ASBCA No. 23918, 80–2 BCA Para. 14,541, p. 71,679.

The fact that subsequent change orders were executed by the parties does not vitiate a previously valid certification. Further, given the nature of the claim and the dispositive tenor of the contracting officer's decision, an additional certification for subsequently executed change orders is not deemed necessary as a jurisdictional prerequisite to a direct access suit in this court since the first valid certification provides the jurisdictional passport. As additional change order modifications were executed, the amount of the plaintiff's claim would increase by 7.5 percent of the price of each change order modification.[6] The significant fact, however, as mentioned previously, is that the decision of the contracting officer was determinative of all fee claims, past, present and future. If the contracting officer decided in plaintiff's favor, the fee in issue would be included as part of all change order modifications, past, present and future. The same is true where, as here, the contracting officer denied the claim, i.e., the fee in issue would not be included in any change order modification, past, present or future. Thus, the stage was properly set, following the denial of the claim by the contracting officer, for review of that determination.

■■■■■ The certification question in this case, as indicated previously, is troublesome.

damages (81–1 BCA Para. 14,872 at p. 73,433); and in Sea Con Corp., supra, the contractor asserted "that definite cost increases cannot be determined until construction is completed." (81–2 BCA Para. 15,316 at p. 75,843). It is in the context of these circumstances, that the Board decisions discussed above held that a claim must contain a "sum certain" or a "determinable amount." See Harnischfeger Corp., supra, 80–2 BCA Para. 14,541 at p. 71,679.

6. The materials at hand indicate that Modification P00032, for example, was the subject of price negotiations by the parties on February 4–6, 1981, prior to the submission of the contracting officer's decision on July 21, 1981. The amount of this change order modification, $4,539,287, was approved by the Board of

Changes on June 17, 1981. However, the parties did not formally execute the change order modification until September 8, 1981. It is not unreasonable to conclude that the contracting officer was aware of these facts, and while he did not include the $4,539,287 figure in his decisional letter, it was obviously omitted because not yet executed, i.e., signed by the parties. As a result, it can be said with some degree of reliability that as of the date of the contracting officer's decision, the contracting officer was aware of at least $7,342,411 ($2,803,124 plus $4,539,287) in change order modifications to which plaintiff's claim amount of 7.5 percent would apply. Therefore, he was in a position to intelligently and meaningfully give consideration to plaintiff's claim.

A rigid, absolute and inflexible interpretation of the certification provision, called for by defendant, would serve defendant well in this case, but such an approach may well cause problems for everyone in other cases. A liberal or loose reading of the certification provision, on the other hand, may well serve to erode the efficacy of the certification requirement. In close cases, like the instant one, a factor that merits close attention is whether putting the stamp of approval on a claim certification comports favorably with the purpose and rationale of the certification provision, Section 605(c)(1). *See Holy Trinity Church v. United States,* 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892); *Sea-Land Service, Inc. v. United States,* 204 Ct.Cl. 57, 76, 493 F.2d 1357, 1358 (1974). Resolution of certification issues are best arrived at on an *ad hoc* basis.

The conclusion reached herein is that the claim certification comports favorably with the purpose and rationale of Section 605(c)(1). The purpose of certification, as mentioned above, is to discourage the unwarranted submission of undocumented or inflated contractor claims. A further purpose was to encourage fair and equitable settlements. The fee amount sought, *i.e.,* 7.5 percent, was clearly stated. The price to which the fee amount or percentage was to be applied were change order modifications negotiated by the parties.[7] Accordingly, there was no specter of an unwarranted, undocumented, inflated and undeterminable claim. The claim as submitted was not such as to protract disputes nor did it cloud the true issue that was to be determined. The claim was specific and it did not shift to the government the burden of

disproving the claim. *See* S.Rep. No. 1118, 95th Cong., 2d Sess., *reprinted in* 1978 *U.S. Code Cong. & Ad.News,* 5235, 5242. Further, the claim, as submitted, was susceptible to settlement since the critical amount, *i.e.,* the 7.5 percent figure, was presented and presumably could be evaluated by the contracting officer. It could easily have been the subject of settlement negotiations but for the decisional basis on which the contracting officer denied the claim.[8] As submitted, the contracting officer was able to give meaningful consideration to the claim, aware of the claim's impact dollarwise, and in relation to existing procurement practices and policies. Because the contracting officer determined as an initial matter that there was no liability, there was no necessity for him to get into quantum. Had he reached the quantum stage, materials were available to him to intelligently and competently evaluate the claim for settlement or entitlement purposes. As a result, the claim certification submitted by plaintiff must be deemed satisfactory for purposes of jurisdiction.

### B. *Final Decision*

In order for a contractor to obtain direct access to this court under the CDA, its claim must have been the subject of a final decision by the contracting officer. 41 U.S.C. Sec. 605(b) (Supp. V 1981).

■ A reading of defendant's briefs indicates that, as to those contract change orders and modifications executed before the date of the contracting officer's decision, defendant concedes there was a final decision rendered. However, defendant argues, since there was no final decision as to the modifications executed after the contract-

---

7. On July 21, 1981, when the contracting officer rendered his decision, the claim was determinable as to all executed change orders up to that time. Since the claim was determinable as of that date, the amount of claim requirement of Section 605(c)(1) was reasonably met. Any other conclusion would unreasonably exault form over substance. Further, the claim was determinable as to all change orders that had been agreed to by that date but not formally executed. The record suggests that the bulk of the claims were determinable on the day the contracting officer rendered his decision. The

fact that a few change orders were issued after the date of this decision does not, and should not, render the certification, which was valid and proper when issued, improper.

8. The contracting officer determined that because the surety indemnity fee resulted from an agreement between father and son, there was a presumption that the agreement was not an arms' length transaction and thus the 7.5 percent indemnity fee was not reasonable, citing Defense Acquisition Regulation (DAR) 15.201.-3(a).

ing officer's decision on July 21, 1981, this court lacks jurisdiction, under the CDA, to consider that portion of plaintiff's claim relating to said modifications. Defendant's reliance on *Paragon Energy Corp. v. United States, supra,* 227 Ct.Cl. at 176, 645 F.2d at 966 is misplaced for that case provides more support for the conclusion reached hereinafter than it does for plaintiff's contention. Defendant even goes so far as assert that plaintiff's claim is, in effect, one for declaratory relief as to those claims and, therefore, not within this court's jurisdiction, citing *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). It is clear plaintiff was not seeking a declaratory judgment. It was obvious, however, that a ruling by the contracting officer on plaintiff's claim would undoubtedly be followed by the contracting officer if similar claims were presented to him at a later time relative to the same contract. Accordingly, the final decision by the contracting officer on the claims in issue would control the award of future equitable adjustments on change order modifications involving the indemnification fee issue. Viewed in this light, the final decision of the contracting officer on the fee question was just that, and was applicable to all change orders issued in this case, past, present and future. Upon review of the submissions of the parties, it is concluded that defendant's contention on this issue lacks merit.

In its written claim to the contracting officer on April 7, 1981, plaintiff clearly sought reimbursement for the 7.5 percent indemnity fee it was incurring, and would incur, due to change orders and other contract modifications issued, and to be issued, by the contracting officer. Thus, plaintiff's claim was not limited solely to the indemnity fee resulting from change orders already executed, but rather sought reimbursement for indemnity fees relating to all changes and all contract modifications issued or to be issued by the contracting officer. It is not without some significance to note, in the context of defendant's argument, that plaintiff had no control over when and to what extent change orders would issue.

An examination of the contracting officer's decision, which was clearly labeled "Final Decision," shows not only that he recognized that plaintiff's claim was for 7.5 percent of all adjustments in the contract price, but also that he rendered a "final decision" on the question of whether plaintiff could recover any indemnity fee in the amount of 7.5 percent for any contract adjusted change order or modification issued under the contract. The contracting officer clearly decided that the 7.5 percent fee was not reasonable and, therefore, not recoverable; he did not simply disallow recovery of the 7.5 percent indemnity fees for change orders already executed and leave open the question of whether the indemnity fees resulting from future executed change orders could be recovered at the rate of 7.5 percent.

It would be unreasonable to expect that had the contractor submitted additional claims to the contracting officer at the end of contract performance, a different decision than the one received on July 21, 1981, would have been forthcoming. It is clear on the basis of materials presently before the court that the July 21, 1981 decision was indeed the contracting officer's "final decision" on the fee indemnification claim as it related to all change orders and contract modifications issued and to be issued in the future. There was a definite tone of finality in the contracting officer's decision on this matter, including the terminal paragraph of his decision setting forth the contractor's right of appeal.

It is concluded that a final decision has been rendered by the contracting officer on the dispute presented to him, which embraced all contract change orders and modifications issued and to be issued during the life of the contract. Moreover, said decision satisfied the CDA prerequisites for bringing suit in this court on a claim seeking fee indemnification costs for all contract change orders and modifications issued during the life of the contract.

The conclusion reached on this issue is in harmony with the spirit and thrust of the CDA which was to encourage early notifica-

tion of a claim to the contracting officer. *See* S.Rep. No. 1118, 95th Cong., 2d Sess., *reprinted in* 1978 *U.S.Code Cong. & Ad. News,* 5235, 5266. If defendant's contentions were adopted, it could encourage postponement of the submission of disputes to the contracting officer until the completion of the contract or, worse still, encourage the submission of a blizzard of claims, one claim filed for each change order modification issued. Such a proliferation of claims should be avoided where possible. It would be unreasonable not to allow for the single resolution of a dispute in a final decision on an issue which controls cost allowability of an item that will surface in change orders to be issued throughout the life of the contract.

### C. *Waiver*

█ It is defendant's position that the plaintiff failed to inform the government that it intended to seek reimbursement for the indemnity fee costs before executing certain contract modifications identified as P0002 through P00015. Defendant does not contend that plaintiff waived its right to assert a claim for reimbursement of indemnity fees for modifications after March 25, 1981, *i.e.,* P00016, *et seq.* Defendant contends that the contractor's unqualified acceptance of contract modification Nos. P0002–P00015, complete on their face, constitutes an accord and satisfaction. The executed contract modifications contained the following clause:

> The foregoing is agreed to as constituting full complete equitable adjustment in full accord Clause 104 General Provision, Equitable Adjustments: Waiver and Release of Claims (7–76).

Accordingly, argues defendant, the plaintiff is bound by, and limited to, the price adjustment reflected in the written modification. Furthermore, defendant maintains that contract Clause 104 entitled, "Equitable Adjustments: Waiver and Release of Claims" requires that all costs claimed by a contractor be included in a request for an equitable adjustment.

Plaintiff, on the other hand, argues that during oral negotiations over the contract modifications in question, *i.e.,* Nos. P0002–P00015, it reserved its right to claim the indemnification costs. Plaintiff points to several letters, discussed, *infra,* which it claims support its position.

The salient facts on this issue are as follows. The first of many change orders in the subject contract began on or about June 24, 1980, when the plaintiff received its first authorization to proceed with a change in the contract work. Plaintiff, in accordance with this authorization, started the changed work in July 1980. Additional change orders were issued by defendant thereafter. Negotiations ensued regarding the various change orders issued. In October 1980, as a result of an audit of plaintiff's cost proposal for a particular modification, the government auditor questioned a third-party indemnification fee in the proposed home office overhead pool. Apparently, as a result of this audit, the government directed inquiries to the plaintiff concerning this cost item. In response to said inquiries, plaintiff's surety sent a letter, dated December 8, 1980, to the Navy. This letter, which states that it is "in response to [Navy] inquiries," describes the terms and history of the indemnification agreement between plaintiff and the UPIC and sought to support plaintiff's claim that the 7.5 percent fee was reasonable. A second letter also dated December 8, 1980, was sent to the Navy from another surety company, Booth & Simpson. This letter indicates that the plaintiff requested that Booth & Simpson write the Navy in support of its position. Lastly, in a third letter, dated March 25, 1981, plaintiff stated that it remained of the view that it was "entitled to recovery of the 7.5 percent indemnity cost which is not included in the amounts of the settlement." In this March 25th letter, plaintiff expressly reserved its claim for indemnification fee costs arising from contract modifications to the subject contract.

Based on these letters, defendant cannot successfully assert that "[p]laintiff did not inform the government that it intended to seek reimbursement for its alleged indemnity fee until it sent a letter, dated March 25,

1981." The contents of the letters dated December 8, 1980, clearly indicate that the plaintiff was claiming reimbursement for indemnification fees before March 25, 1981, and that defendant was fully aware of this position by plaintiff. This is a reasonable conclusion to draw from the facts set forth above.

Although plaintiff has shown that defendant was certainly aware of its claim for indemnification costs prior to March 25, 1981, it is unclear from the materials at hand why plaintiff executed the change orders in question which contain clauses precluding recovery of any additional costs. Plaintiff, of course, asserts that the change orders were not intended to preclude recovery of indemnification costs because plaintiff, through oral negotiations "had effectively reserved its right to make the claim for later resolution." However, given the numerous change orders involved in this case, there are factual questions concerning whether plaintiff had, in fact, orally reserved its claim as to each particular change order. Moreover, there are genuine issues of fact concerning the intent of the parties in executing the contract modifications in issue. Unfortunately, the parties' submissions up to this point shed very little light on these questions.

■ Generally, a contract modification or release which is complete on its face and reflects the contractor's unqualified acceptance and agreement with its terms is binding on both parties. *Inland Empire Builders, v. United States,* 191 Ct.Cl. 742, 752, 424 F.2d 1370, 1376 (1970); *J.G. Watts Constr. Co. v. United States,* 161 Ct.Cl. 801, 805 (1963). In the *Inland Empire Builders* case, *supra,* the Court of Claims stated in pertinent part: " * * * Where a government contractor has, but fails to exercise, the right to reserve claims from the operation of such a release, [footnote omitted], it is neither improper nor unfair to invoke the principle that, absent some vitiating circumstance, the contractor 'cannot thereafter successfully maintain a suit * * * based upon events which occurred prior to the execution of the release.' * * *." (191

Ct.Cl. at 752, 424 F.2d at 1376.) Where, however, there has not been a meeting of the minds of the parties as to a certain claim, then it may be possible for a claimant to prosecute such a claim notwithstanding the executed release. *Brock & Blevins Co. v. United States,* 170 Ct.Cl. 52, 59, 343 F.2d 951, 955 (1965); *Merritt-Chapman & Scott Corp.,* VACAB No. 540 66–2 BCA Para. 5990, p. 27,694. Thus, the question here is whether the parties intended the contract modifications in question to apply to the plaintiff's claim for indemnification fee reimbursement or whether they were only intended to cover change order costs other than indemnification fee costs.

■ In this case, based on the submissions of the parties, there is a genuine issue of fact concerning whether the modifications in question were intended by the parties to cover, or to preclude, recovery of indemnification costs. In light of the aforementioned letters sent to the defendant, it appears not only that the defendant was aware of plaintiff's claim for indemnification costs, but that there may have been some type of oral reservations, preserving such claim, made by plaintiff during negotiations on the change orders. Oral reservations of claims made during contract modification negotiations are given some weight in determining whether a certain claim is included in an executed release. *See Moloney & Rubien Constr. Co.,* ASBCA No. 20652, 76–2 BCA Para. 11,977; *CCC Constr. Co.,* ASBCA No. 20530, 76–1 BCA Para. 11,805; *Merritt-Chapman & Scott Corp., supra,* VACAB No. 540, 66–2 BCA Para. 5990. The letters of December 8, 1980 appear to support its position that it sought to reserve its claim for indemnification costs. This is especially convincing when these letters are combined with the March 25, 1981 letter wherein plaintiff stated: "[W]e * * * remain of the view that we are entitled to recovery of the 7½% indemnity cost which is not included in the amounts of the settlement."

Moreover, it has been held that " * * * where the conduct of the parties in continuing to consider a claim after the execution

of the release makes plain that they never construed the release as constituting an abandonment of the claim. *Winn-Senter Constr. Co. v. United States,* 110 Ct.Cl. 34, 65–66, [75 F.Supp. 255, 260] (1948) * * * the release will not be held to bar the prosecution of the claim." *J.G. Watts Constr. Co. v. United States, supra,* 161 Ct.Cl. at 807. Based on these principles, it is concluded that there are genuine issues of material fact in this case which preclude a summary judgment ruling on the waiver issue. RUSCC 56(c); *South Louisiana Grain Services, Inc. v. United States,* 1 Cl.Ct. 281, (LYDON, J.) at 289 (Cl.Ct.1982); *Technograph Printed Circuits, Ltd. v. United States,* 178 Ct.Cl. 543, 560, 372 F.2d 969, 980 (1967).

Since there are factual questions concerning what transpired during the negotiation process over the change orders and whether plaintiff, in fact, orally reserved its claim as to each particular contract modification, factual development in these areas will assist the court in reaching a proper decision on the matter in accordance with the legal propositions discussed above.

### D. *The Merits of the Claim*

The contract in this case required the plaintiff to furnish payment and performance bonds. Plaintiff claims that because this was its first construction contract, it had no bonding record and, thus, was required by UPIC, a surety company, to first obtain indemnification for the surety from a third party in order to obtain the required bonds. During the course of contract performance, changes in the contract work were authorized and approved by the defendant which substantially increased the contract price. Plaintiff claims that as a result of these increases, plaintiff was required to increase its performance bond correspondingly, which, in turn, increased the costs incurred by plaintiff for the indemnification of its surety. Plaintiff, therefore, seeks reimbursement for the increased surety indemnification costs attributable to all change orders authorized by defendant which increased the total contract price. Plaintiff's claim is for 7.5 percent of this total increased contract price.

In support of its review that such costs are recoverable, plaintiff cites Defense Acquisition Regulations (DAR) which state, in part, that the "costs of bonding required pursuant to the terms of the contract are allowable." (DAR) 32 C.F.R. Sec. 15–205.-4(b) (1981). Here, both the contract and a statute, 40 U.S.C. Sec. 270a(a)(1)(2) required that plaintiff provide performance and payment bonds for the contract work. Moreover, applicable regulations required that the amount of the bonds be maintained at 100 percent of the contract price, even after modifications. (DAR) 32 C.F.R. Sec. 10–102.1(b) (1981).

An initial question is whether a surety indemnification fee qualifies as a "bonding cost," thereby rendering it an allowable cost under (DAR) 32 C.F.R. Sec. 15–205.4(b) (1981). Section 15–205.4(a) states that "[b]onding costs arise when the Government requires assurance against financial loss to itself or others by reason of the act or default of the contractor." Here, there is no question that the government required the contractor to provide a performance and a payment bond. If indemnification of the surety was "necessary" for the plaintiff to provide the required bonding, then the indemnification costs should certainly be included as part of the allowable bonding costs since such costs would then be a condition precedent to plaintiff's ability to meet the contract's bonding requirements. *See* (DAR) 32 C.F.R. Sec. 15–201.4(iii) (1981).

However, it is not clear beyond cavil from the materials at hand that plaintiff, in fact, actually needed to incur indemnification fee costs in order to obtain the requisite bonding. In light of this genuine issue of material fact, a summary disposition of this case is not possible. RUSCC 56(c); *South Louisiana Grain Services, Inc. v. United States, supra.*

Even if one were to assume, *arguendo,* that the claimed indemnification costs were necessary to obtain the requisite bonding, it must also be determined whether these "bonding costs" are recoverable under the applicable regulations. Section 15–205.4(c),

dealing with bonding costs, provides that "costs of bonding required by the contractor in the general conduct of his business are allowable to the extent that such bonding is in accordance with sound business practice and the rates and premiums are reasonable under the circumstances." Thus, the test is whether the fees in question were in accord with "sound business practice" and were "reasonable under the circumstances."

The parties also cite Section 15–201.3 as a test for the allowability of bonding costs. Under this section the test is whether the claimed cost is "reasonable," that is, whether "in its nature or amount, it does not exceed that which would be incurred by an ordinarily prudent person in the conduct of a competitive business."

Section 15–201.3(a) further provides that:

The question of the reasonableness of specific costs must be scrutinized with particular care in connection with firms or separate divisions thereof which may not be subject to effective competitive restraints. What is reasonable depends upon a variety of considerations is and circumstances involving both the nature and amount of the cost in question. In determining the reasonableness of a given cost, consideration shall be given to—

(i) whether the cost is of a type generally recognized as ordinary and necessary for the conduct of the contractor's business or the performance of the contract;

(ii) the restraints or requirements imposed by such factors as generally accepted sound business practices, arm's length bargaining, Federal and State laws and regulations, and contract terms and specifications;

(iii) the action that a prudent business man would take in the circumstances, considering his responsibilities to the owners of the business, his employees, his customers, the Government and the public at large; and

(iv) significant deviations from the established practices of the contractor which may unjustifiably increase the contract costs.

The Court of Claims considered the standard of reasonableness provided by (DAR) 32 C.F.R. Sec. 15–201.3 in *Bruce Constr. Corp. v. United States,* 163 Ct.Cl. 97, 101, 324 F.2d 516, 518–19 (1963). In the context of the facts in the *Bruce* case, the court stated in pertinent part as follows:

A cost is reasonable if, in its nature or amount, it does not exceed that which would be incurred by an ordinary prudent person in the conduct of competitive business. (A.S.P.R. 15–201.3 (1960))

Use of the "reasonable cost" measure does not constitute "an objective and universal procedure, involving the determination of the reasonable value (or reasonable cost of any contractor similarly situated) of the work involved;" [footnote omitted] but determination of reasonable cost requires, in and of itself, an objective test. The particular situation in which a contractor found himself at the time the cost was incurred, *Appeal of Wyman-Gordon Co.,* ASBCA 5100 (1959) and the exercise of the contractor's business judgment, *Appeal of Walsh Construction Co.,* ASBCA 4014 (1957), are but two of the elements that may be examined before ascertaining whether or not a cost was "reasonable."

But the standard of reasonable cost "must be viewed in the light of a *particular* contractor's costs * * *" [footnote omitted] (emphasis added), and not the universal, objective determination of what the cost would have been to other contractors at large.

The Court of Claims further stated that there is a presumption that a contractor's claimed cost is reasonable and that the government must carry the very heavy burden of showing either that the claimed cost was of such a nature that it should not have been expended, or that the contractor's costs were more than were justified in the particular circumstance. *Bruce Constr. Corp. v. United States, supra,* 163 Ct.Cl. at 102, 324 F.2d at 519. The court need not, and does not decide at this time whether the holding in the *Bruce* case is applicable, in whole or in part, to the different facts in this case.

Here there is a clear factual dispute between the parties concerning the reasonableness of the indemnification fees claimed by plaintiff. Plaintiff, as previously mentioned, submitted two letters, dated December 8, 1980, from Booth & Simpson, an uninvolved surety and UPIC, plaintiff's surety. Both letters support plaintiff's claim that, under the circumstances, the 7.5 percent indemnity fee charged is reasonable. In addition, plaintiff attached to its complaint several affidavits in support of its claim. In an affidavit by Rick Rechkoff, a partner at an uninvolved surety brokerage firm, Mr. Rechkoff states that it is a customary business practice for a contractor to incur surety indemnity costs on the bonding of a contract and the change orders attendant thereto. Mr. Rechkoff stated that the fee varies from 5 percent to 25 percent and that, therefore, a 7.5 percent fee was reasonable.

In another affidavit, John Beeson, of another surety company, stated that it is a common business practice for a contractor who does not have a long track record to be required to provide third party indemnity to the surety. Mr. Beeson stated that such indemnity fees generally range from 10 percent to 25 percent and that 7.5 percent is below the average rate paid.

In a third affidavit, William C. Nelson, III, of a surety brokerage firm, similarly stated that it is common business practice to require a contractor, like plaintiff, to provide indemnification for the surety. Mr. Nelson also stated that the 7.5 percent fee is within the zone of reasonableness.

In a fourth affidavit, Mr. Gus Stewart, of a surety brokerage firm, stated that it is common to establish a surety indemnification fee as a percentage of the gross amount of the contract. Mr. Stewart also stated that the 7.5 percent fee is "absolutely reasonable."

Defendant counters plaintiff's claim that the fee was reasonable with the following. First, because the indemnity agreement in question was between related parties, it must be presumed that it was not the result of an arm's length transaction (DAR) 32 C.F.R. Sec. 15–201.2(a) (1981). Defendant cites several administrative board decisions suggesting that costs be scrutinized with particular care where the parties involved may not be subject to competitive restraints. Second, defendant submits an affidavit by Mr. Emile Wynn, a "contract specialist" for the United States Navy. Mr. Wynn stated that the standard industry practice regarding third party indemnification agreements is to charge 50 percent of anticipated profits, which is substantially less than 7.5 percent of the entire contract price. Based on his personal knowledge, Mr. Wynn stated that the government has never paid third party indemnification fees because the contractor has always paid such fees out of its profit. Mr. Wynn further stated that at no time prior to the award did Frank Miller, the indemnitor, mention that Metric Company was paying a 7.5 percent indemnification fee.

Finally, as a policy argument, defendant maintains that the government should not be required to pay costs because it awarded a construction contract to a company without a proven financial or construction record, since it would not incur such costs if the contract had been awarded to a more established contractor which would not require surety indemnification.

The determination of whether the fee costs claimed herein are reasonable is a question of fact. *General Dynamics Corporation v. United States,* 187 Ct.Cl. 597, 606, 410 F.2d 404, 409 (1969). Based on the above-described conflicting affidavits, it is concluded that there are genuine issues of material fact concerning the reasonableness of the claimed indemnification costs which preclude the rendering of summary judgment on the matter. RUSCC 56(c); *South Louisiana Grain Services, Inc. v. United States, supra.* Accordingly, the motions for summary judgment filed by the parties are denied.