**LITTLE RIVER LUMBER COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 385–81C.**

United States Claims Court.

Sept. 28, 1990.

---

William F. Lenihan, Seattle, Wash., for plaintiff.

George M. Beasley, III, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Director, Washington, D.C., for defendant. Jeffrey Handy, Office of Gen. Counsel, Dept. of Agriculture, of counsel.

## OPINION

ANDEWELT, Judge.

In this government contract action filed pursuant to the Contract Disputes Act (CDA), 41 U.S.C. § 601 et seq., plaintiff, Little River Lumber Company (Little River), seeks damages with respect to each of 18 separate timber sale contracts it entered with the United States Department of Agriculture's Forest Service (the Forest Service). In counterclaims, defendant seeks damages with respect to plaintiff's performance on 12 of those 18 contracts. This action is presently before the court on defendant's motion to dismiss plaintiff's claims and plaintiff's motion to dismiss defendant's counterclaims. Each motion alleges a lack of subject matter jurisdiction. As is appropriate when evaluating challenges of this court's jurisdiction, the court has considered the information submitted by the parties outside of the pleadings. See, e.g., Fidelity & Deposit Co. v. United States, 2 Cl.Ct. 137, 145 (1983). For the reasons set forth herein, defendant's motion to dismiss is denied and plaintiff's motion to dismiss is granted in part and denied in part.

## I.

The 18 timber sales contracts in issue cover the harvesting of timber in specified areas of the Black Hills National Forest. The respective bid solicitation for each of the contracts listed, *inter alia,* (1) the quantity of timber on the land, (2) the contract ratio, *i.e.,* the ratio of sawtimber (more valuable) to roundwood (less valuable) on the land, and (3) the appraised value for sawtimber per thousand board feet (MBF) and for roundwood per cord.[1] Pursuant to each solicitation, the Forest Service offered roundwood at the appraisal rate. The competitive aspect of each sale was the bidding for the sawtimber, with bidders generally required to submit bids at or above the sawtimber appraisal rate. Each solicitation also described the Forest Service's method for scaling (measuring) the amount and determining the type (sawtimber/roundwood) of timber that the contractor harvested and was obliged to purchase at the contract prices.

After plaintiff had entered all 18 contracts and after performance on most had commenced, plaintiff complained in an April 14, 1978, letter of "serious errors of substantial nature" made by the Forest Service in each solicitation and contract. The alleged errors included the process by which the Forest Service set the contract ratio and appraisal rates and the method the Forest Service used for measuring the amount of timber harvested by Little River. Plaintiff sought "contract reformation, and other equitable relief" and, alternatively, "rescission of the contracts in some instances."

In its letter, plaintiff alleged that it had lost "well over $1,000,000" on all 18 contracts during a time when it believed it would have made "substantially in excess of $1,000,000." However, plaintiff did not specify the precise amount of total damages nor break down the damages as to each contract. Plaintiff recommended, *inter alia,* the hiring of experts and the conducting of studies and requested that "all future contract offerings be held in abeyance pending further study and correction of the substantial ... errors." Plaintiff requested that "[f]air and reasonable procedures for the continued administration of these contracts ... be established" and warned that "[i]f this request is not granted, serious consideration will ... be given to suspending all logging operations and closing [plaintiff's] mill pending resolution of the various problems."

In a May 30, 1978, response, the Black Hills National Forest Supervisor defended its procedures and refused to suspend the contracts. In an August 1, 1978, letter, relying on essentially the same errors set forth in its April 14 letter, plaintiff alleged that the Forest Service was in breach of each of the 18 timber sale contracts and that "[a]s a result of these breaches, Little River Lumber Company is legally excused from any duty to further perform the contracts until such time as the breaches have been cured." Plaintiff did not request damages but noted that it was reserving "all rights and remedies that it may have" for breach of contract. Thereafter, plaintiff suspended performance on the contracts.

Plaintiff pursued an administrative review of the Supervisor's May 30, 1978, decision not to suspend the contracts, but that effort was unsuccessful. In a final agency determination of August 16, 1979, the Supervisor's decision was affirmed. Prior to this final decision, in March 1979, the CDA became effective.

Under the CDA, contractors "may elect to proceed under [the CDA] with respect to any claim pending then before the contracting officer [on the effective date] or initiated thereafter." Contract Disputes Act of 1978, Pub.L. No. 95–563, § 16, 92 Stat. 2383 (1978). *See, e.g., Folk Constr. Co. v. United States,* 226 Ct.Cl. 602, 603 (1981). Commencing December 28, 1979, and thereafter, plaintiff submitted letters to the contracting officer that purported to constitute written claims on each of the 18 contracts. In each letter, plaintiff elected to have the

---

**1.** A cord is a "measure of wood containing 128 cubic feet, otherwise expressed as a pile of wood 8 feet long, 4 feet high, and 4 feet wide." *Black's Law Dictionary* 305 (5th ed. 1979).

respective claim resolved pursuant to the CDA.

## II.

To understand the substance of the allegations contained in these purported claim letters, it is necessary to understand the methodology the Forest Service employed when it established the contract ratio, set the appraisal rate for sawtimber, and determined the amount of money the contractor owed for harvested timber.

To establish the contract ratio, prior to issuing the solicitations the Forest Service cruised (*i.e.*, estimated) the amount of timber on each contract site and then broke down its estimate as to the amount of sawtimber and the amount of roundwood. The Forest Service estimated the amount of sawtimber in MBF and the amount of roundwood in cubic feet. It then converted the roundwood cubic feet figure into cords by using a conversion factor of 77 cubic feet of solid wood per cord, and then converted the cords figure into MBF by using a conversion factor of two cords per MBF. Based on these estimates, the Forest Service established the percentage ratio of sawtimber to roundwood on the contract sites (*e.g.*, 60–40 means 60% sawtimber and 40% roundwood).

To set the appraisal rate for sawtimber on the contract site, the Forest Service referred to a timber price index known as the Western Wood Product Association (WWPA) Ponderosa Pine Index. The Forest Service adjusted the Ponderosa Pine Index price to account for a series of variables, including logging costs and wood chips removed. The "base rate" for sawtimber, *i.e.*, the minimum at which sawtimber could be sold regardless of the appraisal rate, was $3.00 per MBF. Where the appraisal rate exceeded the base rate, the bidders were obliged to bid at or above the appraisal rate. The bid price was adjusted throughout the contract term to account for changes in the market price of sawtimber as reflected by changes in the Ponderosa Pine Index.

To determine the amount of money the contractor owed for harvested timber, the Forest Service scaled the cut lumber on a sample basis. As when establishing the contract ratio, the Forest Service scaled sawtimber in MBF and roundwood in cubic feet. To convert the roundwood cubic feet figure into cords, it used a table rate known as the Black Hills Roundwood Volume Table. It then converted the cords figure into MBF by using a conversion factor of two cords per MBF. The Forest Service totalled the quantities, in MBF, of sawtimber and roundwood harvested, applied the contract ratio to the total, and then charged plaintiff at the contract price. For example, if the contract ratio was 60–40, the contractor paid for 60% of the total MBF of timber harvested at the sawtimber rate and 40% at the roundwood rate.

## III.

Plaintiff submitted the purportedly written claims on the 18 contracts in three groups of letters dated December 28, 1979 (four contracts), September 2, 1981 (six contracts), and July 8, 1982 (eight contracts). The letters added detail to and expanded on the allegations contained in plaintiff's April 14, 1978, letter. In each letter, plaintiff, in essence, alleged that the errors by the Forest Service in its appraisal process and in its methodology for calculating the amount of harvested timber resulted in plaintiff (1) paying a higher unit price for sawtimber than appropriate, (2) paying for some roundwood at the higher sawtimber rates, and (3) generally paying for more sawtimber and roundwood than it actually harvested. Plaintiff set forth in numbered paragraphs the alleged errors made by the Forest Service and in each letter, the wording of the paragraphs was identical or virtually identical.

In numbered paragraph 1, plaintiff alleged that the Forest Service employed erroneous conversion factors in converting the volume of roundwood from cubic feet into cords (77 cubic feet per cord instead of approximately 60 cubic feet per cord) and then from cords into board feet (500 board feet per cord instead of 333 board feet per cord). In addition, plaintiff alleged that the roundwood volume table (Black Hills

Supplement No. 21, dated August 1972) used by the Forest Service to calculate the cord volume of roundwood harvested contained "systematic errors causing roundwood ... to be over-measured by approximately 50 percent." These errors, if true, would have resulted in an overstatement of the amount of roundwood harvested and, thus, an overstatement of the total amount of timber harvested which, upon application of the contract ratio, would have resulted in plaintiff generally paying for more sawtimber and roundwood than it actually harvested.

In numbered paragraphs 2 and 3, plaintiff specified errors the Forest Service allegedly made that resulted in the appraisal rate in each solicitation exceeding the actual fair market value of the timber on each contract site in violation of applicable regulations. In numbered paragraph 3, plaintiff contended that in view of the characteristics of the timber on the contract sites, the Forest Service should have appraised the contract timber based on the WWPA White Wood Lumber Selling Index rather than the Ponderosa Pine Lumber Sales Index. In numbered paragraph 2, plaintiff described eight errors (a-h) the Forest Service allegedly made when adjusting the index price to establish the appraisal rate.[2]

As to the amount of damages caused by these alleged errors, in numbered paragraph 4 plaintiff added figures that were not present in its April 14, 1978, letter. Paragraph 4 states, in pertinent part:[3]

It is difficult to measure the impacts separately of each of the above mentioned breaches and express those damages in a dollar amount. However, damages can be calculated by determining what Little River would pay for all sawtimber at base rates, $3.00 per MBF, and all roundwood ... at $.50 per cord and all insect-infested timber at $1.00 per MBF. Little River claims that it is entitled to a refund of all amounts paid in excess of those base rates. Little River further claims that it is entitled to recover the amount attributable to base rates and paid on all material that was overmeasured and never actually received as a result of the use of erroneous volume tables and conversion factors and the application of [the contract ratio]. Such amounts are all capable of being arithmetically calculated based on records in possession of the Forest Service.

2. The eight purported appraisal errors are, as follows:

(a) Erroneously assuming that there was a market for roundwood ... when there were several years' supply of unharvested material already under contract to meet the demand of a limited market of approximately 50,000 cords per year. The Forest Service has continued to offer for sale in excess of 50,000 cords per year.
(b) Assuming that there was a market for mill residuals (wood chips), including wood chips when none existed for the reasons stated in (a) above.
(c) Substantially understating the cost of logging roundwood ... as compared with sawtimber.
(d) Erroneously calculating mill overrun of 134 percent, based on partial and incomplete information. In actuality, the mill overrun did not exceed 118 to 120 percent.
(e) Erroneously overstating the amount of wood chips recovered as part of the manufacturing process.
(f) Erroneously appraising a portion of the roundwood as being converted into lumber, when the product being appraised is roundwood-pulp, not sawtimber.

(g) Understating both sawtimber and roundwood logging costs based on the incorrect assumption that the Black Hills National Forest allowable cut was increased by changing the merchantability standards from a 10-inch to an 8-inch minimum scaling diameter and then to a 6-inch minimum scaling diameter. In fact, this change produced at best a minimal increase in the total volume of sawtimber available for sale each year when measured under the Schribner Log Rule.
(h) Improperly requiring purchasers to perform what are in effect pre-commercial thinnings of roundwood as part of the timber sale contract obligations when such should be accomplished by public service contracts. The material has no economic value and imposes severe hardship on purchaser in both performance burdens and cost.

3. In paragraph 4, plaintiff also alleged that as a result of the circumstances described in paragraphs 1–3, plaintiff "was forced to bid and pay for saw timber it never actually received [and] to pay for more roundwood than it ever actually received, a part of which was converted to sawtimber for stumpage payment purposes by virtue of [the contract ratio]."

In numbered paragraph 6, plaintiff stated: "This claim is certified as required by 41 U.S.C. § 605 by a duly authorized representative of the contractor." The certification that accompanied each letter was signed by William F. Lenihan, counsel for plaintiff, and stated, in pertinent part: "I certify that ... the amount requested accurately reflects the contract adjustment for which Little River Lumber Co. believes the Government is liable."

In numbered paragraph 7, plaintiff raised the specter of seeking additional consequential damages. Paragraph 7 states, in pertinent part:

As a direct consequence of the breach of this and all other timber sale contracts between Little River and the Black Hills National Forest, Little River claims consequential damages attributable to the loss of asset value and destruction of the business opportunities and its good will. The monetary amount of this claim is being developed at present and will be provided by supplemental submission.

## IV.

■ The contracting officer responded somewhat differently to each of the three groups of letters. The contracting officer's response to the December 28, 1979, letters did not contain a decision on the claims nor state a time within which a decision would be issued, as required by 41 U.S.C. § 605. Instead, the contracting officer requested "additional information and clarification." Among other things, the contracting officer asked plaintiff to specify the amount of each claim and to indicate how each alleged error applied to each particular contract.[4] Thereafter, the contracting officer took the position that the claims set forth in the December 28, 1979, letters were not "perfected."[5]

The contracting officer responded differently to the claims set forth in the letters dated September 2, 1981, and July 8, 1982. He denied each of the claims therein on a number of grounds. Although the grounds were not identical for each claim, the contracting officer noted in each denial that the claim letter did not specify the dollar amount of the claim and that Lenihan, who certified the claim, was an attorney for plaintiff.

The Forest Service pursued its own claims against plaintiff under the four contracts covered in plaintiff's claim letters of December 28, 1979. During 1980, the contracting officer issued decisions which found plaintiff liable for specified damages for failure to complete the contracts. In its complaint filed in this court on June 18, 1981, plaintiff seeks injunctive relief and damages on those same four contracts. Plaintiff later filed an amended complaint which includes the 14 contracts covered in the September 2, 1981, and July 8, 1982, claim letters. Defendant filed counterclaims seeking damages for nonperformance on 12 of the contracts, only four of which were the subject of a prior contracting officer decision holding plaintiff liable for damages.

In its motion to dismiss, defendant contends that this court lacks jurisdiction over plaintiff's action because plaintiff's claim letters for each of the 18 contracts were defective in that (1) the claims were certified by an attorney instead of an officer of the corporation, and (2) the claims failed to specify the dollar amount alleged to be due. In its motion to dismiss defendant's counterclaims, plaintiff alleges that the CDA is unconstitutional to the extent that it purports to place jurisdiction in this court over government money claims against plaintiff.

4. The contracting officer stated:
You have certified all claims made in the December 28, 1979 letters, however, you did not specify the amount of any of the claims. Section 6(c)(1) of the Contract Disputes Act of 1978 requires only that claims in excess of $50,000 be certified. We would appreciate it if you would specify the amount of each claim and those in excess of $50,000 be certified.

5. While the contracting officer never issued a final decision on the December 28, 1979, claims, such a decision is not a jurisdictional prerequisite. The contracting officer is deemed to have issued a decision because he did not issue a final decision within a reasonable time from the submission of the claim. 41 U.S.C. § 605(c)(3), (5).

## V.

The submission to the contracting officer of a properly certified claim is a jurisdictional prerequisite for a "direct action" suit in the Claims Court under 41 U.S.C. § 605. *See Ball, Ball & Brosamer, Inc. v. United States*, 878 F.2d 1426, 1428 (Fed.Cir.1989). Defendant contends that this court lacks jurisdiction over plaintiff's claims because Lenihan, as an outside attorney, was not qualified to certify the claims.

The CDA's certification requirement, contained in 41 U.S.C. § 605(c)(1), requires merely that the contractor certify the claim.[6] It provides, in pertinent part:

> For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

Corporations must act through individuals, and the ordinary rule is that an individual who is properly appointed as an agent of a corporation has the authority to bind that corporation within the scope of his or her authority.

> All corporations must, from necessity, act and contract through the aid and by the means of individuals. Such individuals may be those holding corporate offices or agents properly appointed by such officers; and as a general rule, corporations have the power to appoint agents with full authority to do acts or enter into contracts within the powers of the corporation. A corporate principal can solely act through its officers, agents, and employees.

18B Am Jur 2d, Corporations § 1341 (footnotes omitted).

There is nothing in the wording of Section 605(c)(1) that suggests this ordinary rule should not apply to certification of claims. An attorney who is properly authorized to certify a claim on behalf of a corporation, therefore, is qualified under the requirements of Section 605(c) to certify that claim. Herein, there is no dispute that Lenihan was authorized by plaintiff to represent Little River and to certify the claims.

Defendant argues that permitting an attorney to certify a claim would undermine Congress's intent in adopting Section 605. That intent was described in *Ball*, as follows:

> The certification requirement furthers an important objective of Congress by "trigger[ing] a contractor's potential liability for a fraudulent claim under section 604 of the Act," *Skelly & Loy v. United States*, 231 Ct.Cl. 370, 685 F.2d 414, 418 n. 11 (1982), and thus "'discourag[ing] the submission of unwarranted contractor claims.'" *Paul E. Lehman, Inc. v. United States*, [230 Ct.Cl. 11] 673 F.2d 352, 354 (Ct.Cl.1982) (quoting S.Rep. No. 1118, 95th Cong., 2d Sess. 5, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5235, 5239). "Congress wanted to hold the contractor personally liable, and it considered the best way to do this would be to require contractors personally to certify their claims." *Donald M. Drake Co. v. United States*, 12 Cl.Ct. 518, 519 (1987).

878 F.2d at 1429. But giving the statutory language its ordinary meaning would not be inconsistent with the objective of triggering contractor liability for fraudulent claims. Corporations are liable for the authorized acts of their agents, and plaintiff

---

**6.** Relying on *Folk*, 226 Ct.Cl. at 604–05, and *Gregory Lumber Co. v. United States*, 9 Cl.Ct. 503, 515–16 (1986), plaintiff contends that the certification requirement in Section 605(c)(1) does not apply to plaintiff's claims herein because plaintiff's claims were pending when the CDA was enacted. But, although plaintiff originally raised the alleged errors in its April 14, 1978, letter, there was no request for payment pending when the CDA was enacted. Indeed, in its subsequent August 1, 1978, letter, plaintiff indicated it had not presented a damage claim by stating that it reserved "all rights and remedies" it may have for breach of contract which necessarily include claims for damages. Moreover, the three groups of claim letters in issue do not suggest that claims were pending but rather purport to be claims themselves.

would therefore be liable if the claims certified by Lenihan were fraudulent. As explained in the *Restatement of Agency Second* § 257 (1958):

> A principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a servant or other agent, if the representation is:
>
> (a) authorized;
>
> (b) apparently authorized; or
>
> (c) within the power of the agent to make for the principal.

■ *Ball* involved interpretation of Federal Acquisition Regulation (FAR) 33.207, 48 C.F.R. § 33.207 (1988), which defines who may certify a claim when the contract is subject to FAR. Section 33.207 provides, in pertinent part:

> (c)(1) If the contractor is an individual, the certification shall be executed by that individual.
>
> (2) If the contractor is not an individual, the certification shall be executed by—
>
> (i) A senior company official in charge at the contractor's plant or location involved; or
>
> (ii) An officer or general partner of the contractor having overall responsibility for the conduct of the contractor's affairs.

Clearly, Lenihan would not qualify to certify a claim under this regulation. But, as defendant acknowledges, the FAR does not apply to the contracts involved herein.

To support giving Section 605(c) a more restrictive interpretation than its ordinary meaning, defendant relies, in part, upon the testimony of Admiral Rickover during hearings on the CDA. That testimony, quoted in *Ball*, is as follows:

> [The Act should r]equire as a matter of law that prior to evaluation of any claim, the contractor must submit to the Government a certificate signed by a senior responsible contractor official, which

states that the claim and its supporting data are current, complete and accurate. In other words, you put the contractor in the same position as our working man, the income tax payer who must certify his tax return....

878 F.2d at 1428. But in *Ball*, the Court of Appeals for the Federal Circuit correctly characterized as a "suggestion" Admiral Rickover's position that the certification should be made by a "senior responsible contractor official." *Id.* at 1429. Ultimately, Congress did not adopt that suggestion when it drafted the specific language of Section 605.

In *Ball*, the court's focus was limited to interpreting the applicable FAR. The court concluded that that regulation constituted "a reasonable explanation" of how the "contractor shall certify" a claim under Section 605. The court did not interpret the less restrictive language of Section 605(c) nor suggest that the FAR was the only reasonable explanation of who may certify a claim under Section 605(c). Indeed, in *Ball*, the court explained: "We apply the regulation as written, and we reject the appellant's proposal to expand the regulation beyond its terms." *Id.* Hereto, the court similarly applies Section 605(c) "as written" and rejects defendant's attempt to add requirements to the certification process that reasonably could have been, but were not, included by Congress when it drafted the statute.[7]

## VI.

■ Defendant also contends that this court lacks jurisdiction over plaintff's claims because plaintiff did not state in any of the letters its monetary claims in an amount certain. Clearly, the FAR, in defining the term "claim," requires the contractor to specify a sum certain.[8] But, as noted above, the FAR does not apply herein. Unlike the FAR, the CDA contains no definition of the term "claim" and the sole reference in the CDA to a claim specifying

---

**7.** To the extent that *Romala Corp. v. United States,* 12 Cl.Ct. 411 (1987), is inconsistent with this approach, this court respectfully declines to follow that decision.

**8.** FAR § 33.201 states, in pertinent part, that "'Claim' ... means a written demand ... seeking ... the payment of money in a sum certain."

an amount is the statement in Section 605(c)(1) that "[f]or claims of more than $50,000, the contractor shall certify that the claim is made in good faith ... and that *the amount requested* accurately reflects the contract adjustment for which the contractor believes the government is liable." (Emphasis added.)

In *Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987), the Court of Appeals for the Federal Circuit explained:

> We know of no requirement in the [CDA] that a "claim" must be submitted in any particular form or use any particular wording. All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim. *See, e.g., Tecom [, Inc. v. United States,* 732 F.2d 935, 936–37 (Fed.Cir.1984) ]; *Metric Constr. Co. v. United States,* 1 Cl.Ct. 383, 392 (1983).

In *Metric,* the contractor filed a claim for payment of a 7.5% indemnification fee it had incurred in conjunction with change orders and other contract modifications. As here, the government alleged that the claim was jurisdictionally deficient for failing to state the claim as a sum certain. The court, however, did not find the failure to state a sum certain fatal. The court indicated that the "basis" of the dispute between the parties was the entitlement to recover the 7.5% indemnification fee and that once that fee issue were decided, "the amount of the claim would be easily determinable by the contracting officer since it would be a matter of simple arithmetic." 1 Cl.Ct. at 392.

The same reasoning applies here to plaintiff's claims for damages involving over-

payment for the timber it harvested. In its claim letters, plaintiff contended that the Forest Service had made a series of appraisal errors that resulted in an artificially high contract price. Plaintiff specified that the appropriate contract rate was the base rate for timber, *i.e.,* $3.00 per MBF for sawtimber, $.50 per cord for roundwood, and $1.00 per MBF for all insect-infested timber. In addition, plaintiff contended that defendant used erroneous conversion factors and an erroneous roundwood volume table when determining the volume of sawtimber and roundwood actually harvested. It specified the correct conversion factors and the extent to which defendant's table overmeasured the amount of roundwood—by approximately 50%.

Herein, the "basis" (*id.*) of the dispute between the parties concerning overpayments is whether plaintiff is correct that the base rate rather than the appraisal rate should be used, and that its proposed conversion factors and 50% adjustment to the roundwood table rates should be employed. Assuming plaintiff's contentions are correct, as in *Metric,* defendant could arithmetically calculate the amount of the overpayment claim for each contract.[9] As in *Metric,* plaintiff herein gave defendant "adequate notice of the basis and amount of the claim." *Contract Cleaning,* 811 F.2d at 592.

### VII.

■ While plaintiff's claim letters gave sufficient information as to the amount of alleged overpayments, the same cannot be said with respect to the consequential damages mentioned in numbered paragraph 7 of the claim letters. Plaintiff did not attempt to quantify consequential damages but instead stated that "[t]he monetary

---

**9.** Defendant scaled the amount of sawtimber and roundwood plaintiff harvested, applied the contract ratio, and charged plaintiff for the timber at the contract prices. Thus, defendant's records show the amount of sawtimber and roundwood for which defendant charged plaintiff at the contract prices. To calculate the amount that plaintiff alleges it should have paid on each contract, defendant would simply have to (1) recalculate the amount of sawtimber and roundwood harvested on the contract site by

using plaintiff's proposed conversion factors and 50% adjustment to the roundwood volume table and (2) value the resulting quantities of timber at the base rates rather than the appraisal rates. The amount of overpayment sought in each claim would be the excess of the amount plaintiff actually paid over the amount plaintiff alleges it should have paid. The calculations, while more complex than those in *Metric,* are arithmetic in nature and the rationale of *Metric* would appear to apply.

amount of this claim is being developed." Defendant contends that this defect is fatal because a single claim, including overpayments and consequential damages, was presented and the total amount of that claim was not ascertainable from the information presented in the claim letters. But the request for overpayments properly can be separated from the request for consequential damages, and plaintiff's failure to quantify the amount of consequential damages does not render the letters insufficient to present proper CDA claims for alleged overpayments.

A single contract can give rise to a series of distinct claims. *Placeway Constr. Corp. v. United States*, 910 F.2d 835, 840 (Fed.Cir.1990). Herein, while the claim letters are not a model of clarity, it appears that plaintiff intended to present distinct claims in the claim letters for overpayments and for consequential damages. It also appears that plaintiff, while recognizing that the request for consequential damages was not yet ripe, sought an immediate decision on its overpayment requests. For example, plaintiff first mentioned consequential damages toward the end of each claim letter, after it described overpayment damages and after it discussed its certification of the "claim." Indeed, the certification stated that "the amount requested accurately reflects the contract adjustment for which Little River Lumber Co. believes the Government is liable." But this certification could not reasonably cover consequential damages because the claim letter did not state the amount of consequential damages sought. In addition, after describing the consequential damages, the letters stated that "[t]he monetary amount of *this claim* is being developed at present and will be provided by supplemental submission." (Emphasis added.)

In any event, plaintiff's apparent intent to present two distinct claims is not controlling. "To determine whether ... separate claims, or only a fragmented single claim, exists, the court must assess whether or not the claims are based on a common or related set of operative facts." *Id.* Here, the claim for consequential damages is based on a distinct set of operative facts from the individual overpayment claims.

Plaintiff presented distinct overpayment claims for each of the 18 contracts. While the 18 overpayment claims have a common theme, each is distinct and each turns on its own set of operative facts. Indeed, depending upon the characteristics of the timber on the various contract sites, plaintiff could prevail on some overpayment claims but not on others. For example, plaintiff's allegation that the appraisal rate in the contract was above the fair market rate could prove correct for the timber on certain contract sites but not on others.

The request for consequential damages differs in that plaintiff did not seek separate consequential damages for the alleged breach of each individual contract. Rather, plaintiff alleges that consequential damages arose from the cumulative effect of the breach of all 18 contracts. Plaintiff alleges that the combination of 18 alleged breaches led to the closing of its mill and to "the loss of asset value and destruction of ... business opportunities and ... good will."

The operative facts considered in evaluating any single overpayment claim, therefore, would be only a small part of the facts the contracting officer would have to consider to resolve in plaintiff's favor the consequential damages claim. In addition, the contracting officer would have to consider, *inter alia*, the operative facts relating to each alleged breach of the 17 other contracts plus the foreseeability of the consequential damages at the time the contract was entered. *See Olin Jones Sand Co. v. United States*, 225 Ct.Cl. 741, 742 (1980) (damages are not recoverable if "too remote and indirect"); *Solar Turbines, Inc. v. United States*, 16 Cl.Ct. 304, 316 (1989). Since different sets of operative facts are involved, the claims for overpayments and for consequential damages can properly be presented as distinct claims. There is no question here of an attempt to split the claims to avoid a certification requirement. *See Placeway*, 910 F.2d at 840. Plaintiff included a certification with each claim letter.

## VIII.

■ Of the 12 counterclaims filed by defendant, only four have been the subject of a prior contracting officer decision. Since the government's raising of a claim before a contracting officer is a prerequisite to Claims Court jurisdiction under the CDA, *Joseph Morton Co. v. United States,* 757 F.2d 1273 (Fed.Cir.1985), this court lacks jurisdiction over the other eight counterclaims.

As to the four counterclaims that were the subject of a prior contracting officer decision, plaintiff contends that the CDA is unconstitutional to the extent that it places jurisdiction over damage claims against plaintiff in the Claims Court, a court organized under Article I of the Constitution. Plaintiff contends that the Constitution requires that government breach of contract claims be heard (1) in a court organized under Article III of the Constitution, and (2) in a court that provides for jury trials. But the Court of Appeals for the Federal Circuit in *Seaboard Lumber Co. v. United States,* 15 Cl.Ct. 366 (1988), 903 F.2d 1560 (Fed.Cir.1990), rejected the identical constitutional arguments and affirmed this court's jurisdiction over government claims for monetary damages under government contracts.

### *Conclusion*

For the reasons set forth above, defendant's motion to dismiss plaintiff's claims is denied and plaintiff's motion to dismiss defendant's counterclaims is granted with respect to the eight claims that were not the subject of a prior contracting officer decision. On or before October 29, 1990, the parties shall file a status report, jointly or separately, advising the court as to their intentions with respect to further proceedings in this action.

IT IS SO ORDERED.